Madden, Judge
delivered the opinion of the court:
In 1938 plaintiff, in response to the defendant’s invitation, bid upon and was awarded the contract for the construction of a new post office building at Beading, Pa. In this suit plaintiff seeks compensation, beyond the amount specified in the contract and already paid him, for three items: (1) the value of a “diner” restaurant building, which, plaintiff says, the defendant agreed that he might salvage from the site, but which was removed by another person,, to whom it belonged; (2) the cost of excavating a large part of the area formerly covered by the Supreme Bealty Company building, which area, plaintiff says, -the defendant represented had been excavated before the contract was made; (3) the extra cost of excavating rock found within. *160 a part of the area of excavation for the new building, plaintiff asserting that the existence of this rock was an unexpected condition encountered in the performance of the contract which entitled him to extra compensation under Article 4 of the contract.
As to the claim for the diner, the pertinent facts are •as follows. The defendant sent plaintiff, as a prospective bidder, the proposed specifications which were to be a part ■of the contract. Paragraphs 3-2 and 3-6 of these specifications said, respectively:
3-2. Drawing No. X-l-A relating to conditions of the site is not to become a contract drawing. It is furnished bidders only for such use as they may choose to make of it. The accuracy of data given on this drawing is not guaranteed. The structure known as the “Supreme Realty Company” (21-29 North 5th Street) on Drawing No. X-l-A has been or will be removed to the top of the foundation walls or to the ground level by others. •
*****
3-6. The contract will also include the demolition of all structures on the site, except that known as the “Supreme Realty Company” (27-29 North 5th Street), which will be removed to the top of the foundation walls or to the ground level by others.
Drawing No. X-l-A was a plat of the square- on which the new post'office-was to-be erected. It showed the several tracts making up the square, the names of their former owners, and what structures were on them. One lot was marked “This property from Supreme Realty Company.” The drawing showed a three story brick building occupying this entire lot from Fifth Street to Church Street. The •adjoining lot to the south, fronting on Fifth Street and -extending only a part of the way toward Church Street, was marked “This property from Harvey S. Adams * * •and the drawing showed a “diner” restaurant located on ■the west frontage of the lot. The Supreme Realty Company building had two street numbers, 31 and 33, painted on its ■front in appropriate places. The “diner” had no numbers marked on it but was known to the local post office staff as Nos. 27-29 for mail delivery purposes.
*161 Plaintiff read the specification as meaning that the three-story brick building would be removed by others, and that he could, if he got the contract, remove the diner as his own. As he was admonished to do by paragraph 5-4 of the specifications (see finding 3), he gave it a salvage value and reduced his bid by that amount, $7,500.00, which was the reasonable value of the diner. Another bidder, who discovered before the day for submission of bids that the street numbers 27-29, attributed to the Supreme Realty Company building in the specifications, did not belong to the building shown on the drawing as that building, asked the defendant for a clarifying statement. The defendant then notified all prospective bidders that it was adding to paragraph 3-6 of the specifications the following language: “The demolition of the ‘Supreme Realty Company’ building at 31-33 North Fifth Street will be included in the contract.”
Plaintiff read this addendum as meaning that the defendant was changing the specifications so. that it now expected, the contractor to remove the three-story brick building, which, plaintiff had supposed, was to have been removed by others under the original specifications. We have concluded that that was the meaning reasonably to be gathered from the defendant’s writings. The statement in the original specifications that “the contractor is required to include the demolition of all structures on the site except that known, as the Supreme Realty Company .* * *, which will be removed * * * by others” applied exactly to the three-story brick building as the only building not to be removed, so far as the drawing was concerned, and applied with equal exactness to the physical situation disclosed by an inspection of the site, except as to the street numbers assigned to the building in the specifications. It was not to be expected that a prospective bidder would look at the numbers on the building, when he was told that it was to be removed by someone else. The fact that there were no numbers on the diner made it even more unlikely that one inspecting the site would, by chance, discover the defendant’s error. We think, therefore, that the defendant is bound by the meaning which plaintiff reasonably gathered from the defend *162 ant’s writings, and must compensate plaintiff for the loss of the diner which plaintiff expected to get.
The controversy about the excavation under the Supreme Eealty building arose as follows. , Drawing No. X-l-A,, hereinbefore referred to as having been sent out by the defendant with the specifications, contained the legend on the site of the Supreme Eealty Building, which was about 30 feet wide and 228 feet long, “Conor. Basement Floor full length.” This legend was written at about the center of the site as shown on the drawing.
Plaintiff’s prospective subcontractor for the demolition and excavation required by the contract, a Mr. Herfurth, visited the site and made his bid to plaintiff before plaintiff made his bid to the defendant. His examination of the site is described in finding 5. In spite of the fact that he was a demolition and excavation contractor of long experience, and that he had the greatest possible financial interest in not overlooking any work which would be required under the contract, we think that he was, in some degree, careless in his inspection. This carelessness was induced by the erroneous and misleading legend on the defendant’s drawing No. X-l-A. That legend conveyed the meaning that the-site of the building was already excavated. We think that where such an erroneous statement is made in such circumstances that it has the natural effect of misleading the person to whom it is addressed, its consequences are not removed by a caveatory admonition such as that of paragraph 3-2 of the specifications (see finding 3). We recognize that the language of that paragraph, “The accuracy of data given on this drawing is not guaranteed,” is a pointed warning. Yet the statement on the drawing ought not to have been made at all if the one who made it had no knowledge of the facts. If on the other hand, he made an examination and reached the same conclusion that Herfurth did, the discovery of the true situation would have been as unexpected to him as it was to Herfurth and plaintiff. If that is what happened, plaintiff would seem to be entitled to the relief contemplated by Article 4 of the contract, discussed hereinafter. Plaintiff’s bid did not contemplate the *163 necessity for excavation under a considerable part of the Supreme Eealty Building. His omission was induced by the defendant’s misleading drawing. We think the defendant should not gain such an advantage from its use of this drawing, and we conclude that plaintiff may recover the •cost of the additional excavation. See United States v. Atlantic Dredging Co., 253 U. S. 1; Hollerbach v. United States, 233 U. S. 165.
The basis of plaintiff’s third claim is, as we have said, that the rock which he encountered in excavating the site was a “subsurface and/or latent condition at the site materially differing from those shown on the drawings or indicated in the specifications” or was “an unknown condition of an unusual nature differing from those ordinarily •encountered and generally recognized as inhering in work of the character provided for in the plans and specifications,” and that he was entitled to additional compensation under Article 4 of the contract (see finding 7).
Drawing 1-1, designated “Approach Plan,” was made a part of the contract. It incorporated by reference the information shown on drawing X-l-A relating to the nature of the soil as disclosed by a test pit dug by the defendant and eight other excavations made by various persons in connection with other building operations in the area surrounding the block on which the new post office was to be built (see finding 6). The drawing said that there Avas no place on the site to dig another test pit. The notes showed that no rock was encountered in the test pit, although it was dug several feet deeper than plaintiff was required to excavate, and that none was encountered in the ■other nearby excavations. They said “nearest rock outcrop is two blocks west of site on Washington Street.”
It seems to us that the purpose of the defendant in giving this information to prospective bidders was to induce them to bid upon the assumption that the material to be excavated was, on the whole, not more solid than yellow clay. All the emphasis and shading of the expression of the information was in that direction, as a reading of the notes will show. For example, the concluding statement did not *164 say simply “There is outcropping rock two' blocks west of site on Washington Street,” which a bidder might have taken as a warning. It said, after stating that o'n the site,, and around it, nothing but yellow clay had been encountered,. “Nearest rock outcrop is two blocks west of the site on Washington Street.” The effect of the statements was to cause Herfurth, an experienced excavator, and plaintiff, an experienced builder, to expect to find yellow clay and to bid accordingly, to their financial hurt.
The defendant’s witness, Lund, who had not prepared the’ specifications, testified that the data given pointed plainly, when read by an informed person, to the probability of rock on the site. We think that this was wisdom after the event. It is charitable to conclude, and we do-conclude without resorting to charity, that the persons who-prepared the drawing and the notes for the defendant did not anticipate rock excavation. If we are wrong about this, and those persons did read the data as indicating rock, they set a trap for the bidders and caught plaintiff.
We think, therefore, that the subsurface condition was an unforeseen one, within the meaning of Article 4 of the contract, and that plaintiff was entitled to an adjustment of price, and not having received it, he is here entitled to compensation for the unexpected work. If this situation is not within the contemplation of Article 4, the alternative is that bidders must, in order to be safe, set their estimates on the basis of the worst possible conditions that might be encountered. Such a practice would be very costly to the defendant. We suppose that the whole purpose of inserting Article 4 in the defendant’s contracts was to induce bidders not to do that.
Article 15 of the contract provided:
Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising-under this contract shall be decided by the contracting officer subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto. In the meantime the contractor shall proceed diligently with the work as directed.
*165 The defendant urges that, there having been a determination of the contracting officer which was affirmed on appeal by the head of the department, as to each of the items here sued for by plaintiff, the court is not free to determine plaintiff’s rights. As to the claims concerning the diner and the additional excavation under the Supreme Realty Building, we think that the question at issue is a question of law. It is, in brief, “what are the legal consequences, in the way of contractual liability on the part of the defendant, of certain representations made by it in connection with its invitation to plaintiff to negotiate a contract with it.” Such disputes were not covered by Article 15.
As to the third item of dispute, that about the rock unexpectedly encountered in the course of excavation, the real question is whether, in view of the information furnished plaintiff by the defendant with reference to soil conditions on the site and in the neighborhood, the rock was an unanticipated subsurface or latent condition within the meaning of Article 4 of the contract. As to that, there is no evidence that anyone who took part in the negotiation of the contract, either on the side of the defendant or plaintiff, anticipated the condition that was actually encountered. That being so, the decisions of the defendant’s officials were lacking any substantial support in the evidence. If the case were being tried to a jury, and the evidence stood as it does here, the court would direct a verdict. We do not believe that plaintiff, in agreeing to Article 4 of the contract, intended to submit his rights under the contract to the hazard of a decision not having any substantial evidence to support it. We think, therefore, that Article 15 does not prevent us from deciding this question also on its merits.
Plaintiff is entitled to recover $13,699.84. It is so ordered.
Jones, Judge; Whitaker, Judge; Littleton, Judge; and Whaley, Chief Justice, concur.