MOORMAN et al. v. UNITED STATES.

No. 46439.

United States Court of Claims.

March 7, 1949.

V. J. Bodovitz, of Oklahoma City, Okl., for plaintiff.

William A. Stern, II, of Washington, D. C., and H. G. Morison, Asst. Atty. Gen., for defendant.

Before JONES, Chief Justice, and LITTLETON, WHITAKER, MADDEN, and HOWELL, Judges.

LITTLETON, Judge.

The plaintiff partnership, J. W. Moorman & Son, seeks to recover the sum of $117,-916.51 as an additional payment alleged to be due for extra work involving the grading and excavation of 298,973 cubic yards of earth and rock, from an area within a project known as the Midwest Air Depot which plaintiff says was outside the scope of its contract of April 3, 1942, with defendant for certain grading work for the Oklahoma City Aircraft Assembly Plant.

This work was performed as a result of a written order duly issued by the contracting officer June 18, 1942, which plaintiff duly protested in accordance with paragraph 2–16, General Provisions, of the contract specifications. Plaintiff claimed that the work covered by the written order was not called for by its contract; that it was more expensive to perform by reason of its nature and the circumstances and conditions under which it had to be done; and that a price of 84 cents a cubic yard should be paid therefor instead of the original contract unit price of 24 cents.

As shown in finding 14, the contracting officer denied the claim principally on the ground that defendant had made certain red pencil changes on a drawing, known as Plot Plan G–3, which he asserted had been furnished to plaintiff with the invitation for bids (but which plaintiff strenuously denied), showing that the work in question was to be included in the contract for the grading of the Aircraft Assembly Plant site. In addition, the contracting officer resolved all doubts in favor of the Government and reached the conclusion that independently of the red markings in plan G–3, the specifications and original drawings were sufficient to show that the grading and excavation work performed outside the Aircraft Assembly Plant site and within the Midwest Air Depot area was to be included within contract for grading the assembly plant site.

After a hearing on plaintiff's appeal, the Board of Contract Appeals, acting for the

Secretary of War, affirmed the decision of the contracting officer as to the claim now before the court, and denied plaintiff's claim. In its opinion on this claim (finding 17) the Board did not discuss the changed drawing alleged to have been sent to plaintiff with the invitation for bids and denied the claim on its interpretation of the specifications and original drawings. In a separate opinion on another item of plaintiff's claim for grading an industrial road from a point in the Midwest Air Depot site to entrance "D" of the Aircraft Assembly Plant site, the Board reversed the decision of the contracting officer and concluded that this work had not originally been contemplated by either party. For this extra work, which involved 13,676 cubic yards, plaintiff was allowed 60 cents a cubic yard by the contracting officer.

We are of the opinion that the decisions of the contracting officer and the head of the department cannot be sustained under the facts and the specifications and drawings.

■ The defendant conceded at the hearing of the case in this court that plaintiff never received the drawing marked in red to indicate that the taxiway and connecting areas, which were a part of the airfield, known as Tinker Field, at the Midwest Air Depot, were to be included in the contract for grading the Aircraft Assembly Plant site. It contends, however, that plaintiff may not recover any additional amount for this work on the ground that the contract clearly required plaintiff to grade the taxiway west of Range 29, because the word "taxi-ways" was used in the specifications in paragraph 1-03(b), Nature of Work, and in paragraph 3-02, Scope, and the only taxiway designated on the drawings was the one plaintiff was required to grade west of Range 29. Defendant further contends that, in any event, the decisions of the contracting officer and the War Department Board of Appeals to the effect that the work in question was not outside the contract requirements, were final.

We cannot agree with defendant's contention that the contract documents clearly required plaintiff to grade the taxiway west of Range 29. Paragraph 1-02 of the specifications (finding 2) describes exactly the limits of the assembly plant site and Location Plan G-1 and Plot Plan G-3, conform exactly to that description as to the assembly plant site. The specifications are designated as "Specifications For Grading of Plant Site, Oklahoma City Aircraft Assembly Plant," and nowhere therein is the Midwest Air Depot airfield mentioned. The fact that Location Plan G-1 showed all of the Midwest Air Depot and airfield site and the Plot Plan G-3, which was a detail drawing with reference to the assembly plant, was extended west of the assembly plant site so as to show a part of the Midwest Air Depot and airfield, was not sufficient, in view of the provisions of the specifications and other information shown on Plan G-3, to put plaintiff on notice that it would be required or called upon to perform work outside the assembly plant site. Plaintiff so interpreted the specifications and drawings and we have found that its interpretation was reasonable and proper. The changes which defendant found necessary to make in red on drawing G-3 (not furnished to plaintiff) in order to show that certain grading west of Range 29 was to be included in the plant site grading work, support plaintiff's interpretation of the original drawings. The original drawings G-1 and G-3, furnished to plaintiff, were approved by the defendant's district engineer and contracting officer on March 20 and 26, 1942, respectively, and obviously they were intended to conform to the specifications. The invitation for bids was sent out on March 26, 1942.

Paragraph 1-02 specifically defines the boundaries of the plant site and the next paragraph 1-03(b), Nature of Work, provides that the work to be done under the specifications includes the furnishing of all labor, equipment, etc., necessary for the "grading of the plant site,"—not some other plant site or some other project far or near—"including building sites, roads aprons, taxiways, permanent parking areas, disposal plant site, and all other building site areas shown on the plans." Plan G-3 designates by name everything mentioned in paragraph 1-02 and 1-03(b), except "taxi-ways." However, we think the ab-

sence on this drawing of any specific designation of "taxi-ways" mentioned in 1–03 (b) is unimportant, first, because a large plant for assembling airplanes would normally need taxiways within the site to be graded; and, second, because, taxiways in the sense in which that term must have been used in paragraph 1–03(b), Special Provisions, and in paragraph 3–02, Technical Provisions, are clearly shown on drawing G–3 as we have set forth in finding 2. On this plant site the drawing G–3 shows, among other buildings, a large aircraft Assembly Building; some distance southeast thereof is the Compass Checking Station, and some distance west of the compass station and southwest of the Assembly Building are located a large aircraft Hangar and Paint Shop. Plan G–3 clearly shows grading work to be performed for concrete and asphaltic concrete surfacing of these areas, extending along the east and west of the Assembly Building to the other points and buildings mentioned, and between the Compass Checking Station and the Hangar. A certain strip adjoining the Hangar is designated as "Concrete Apron." The other areas mentioned are not designated on the Plan G–3 otherwise than as "Concrete" or "Asphaltic Concrete," but it seems clear enough from a proper reading of this drawing that it intended to show these areas as "taxi-ways" for moving planes assembled in the Assembly Building to the Compass Checking Station, to the Hangar and Paint Shop, and to the parking areas.

In the circumstances of this case we cannot interpret the word "taxi-ways," as used in paragraph 1–03 of the specifications relating to the assembly plant site, as meaning that the contractor grading that site must also do extensive grading and excavation of ditches for an airfield taxiway 6,600 feet long and 100 feet wide, for the existing airfield on the Midwest Air Depot site, some distance west of the assembly plant site. Such an interpretation would, we think, be an unreasonable one. If the description and boundaries set out in paragraph 1–02 and the boundaries shown on Plan G–3, marked "Property Line," could not be relied on, there was then no discernible limit to what the Government intended except its own interpretation. Cf. W. E. Callahan Construction Co. v. United States, 91 Ct.Cl. 538, 611; W. H. Armstrong & Company v. United States, 98 Ct.Cl. 519, 527; John K. Ruff v. United States, 96 Ct. Cl. 148, 164. We think there was no reason for plaintiff to suppose, as defendant argues there was, that the Midwest airfield taxiway in question, and shown on the plans, was a necessary part of the Assembly Plant project so that plaintiff should have inquired whether or not it would be required to grade it even though it was located off the plant site limits definitely in the specifications.

We cannot agree with defendant's second argument that plaintiff is barred from recovering on the ground that the decisions of the contracting officer and the War Department Board of Appeals, acting for the head of the department, were final and conclusive by virtue of paragraph 2–16 of the specifications. A similar contention was considered and denied in the case of Pfotzer v. United States, 77 F.Supp. 390, 111 Ct.Cl. 184. The decisions in United States v. Joseph A. Holpuch Co., 328 U.S. 234, 66 S.Ct. 1000, 90 L.Ed. 1192, and United States v. Blair, 321 U.S. 730, 64 S.Ct. 820, 88 L.Ed. 1039, cited by defendant, are not in point. Paragraph 2–16 is entitled "Claims, Protests and Appeals" and is primarily a procedural provision intended to provide an orderly method for carrying out the provisions and purposes of Article 15 of the standard formal contract. Such a paragraph in the "General Provisions" of the specifications has itself come to be a standard provision, and, as we pointed out in the Pfotzer case, supra, the fact that the specifications, which are intended to delineate the work to be done and the procedures to be followed, are made a part of the contract by Article 1, does not warrant the conclusion that they override an express provision of the contract. Provisions such as paragraph 2–16 must, if possible, be read and interpreted in the light of and consistent with the provisions of the formal contract. When this is done, there is no conflict between Article 15 and paragraph 2–16.

The standard contract duly prepared and approved by the proper author-

ity of the Government is binding upon the writer of specifications covering a specific project, and such contract provisions control unless they are modified or changed by a proper provision, approved by proper authority, inserted in the article of the contract provided for that purpose. Otherwise, the standard contract itself would be of little, if any, use, and the uniformity of understanding among contractors, contracting officers and others concerned, and the values flowing to the Government as well as to contractors by reason of such standard contract provisions, would not be obtained but would be left in a state of confusion and uncertainty. The history of the preparation and adoption of the standard forms of Government contracts shows that it was for reasons such as above mentioned, among others, that led to the adoption of the standard contract such as we have here.

■ We think the provision in paragraph 2–16 of the specifications that the decision of the Secretary of War on appeal " * * * shall be final and binding upon the parties to the contract," properly interpreted, means that such decision shall be final and binding to the extent provided in Article 15 of the Contract. Paragraph 2–16 of the original specifications provided that appeals from decisions of the contracting officer should be taken to the Chief of Engineers, U. S. Army, "whose decision shall be final and binding upon the parties to the contract", and stated that he had been designated by the Secretary of War to make "final decision." The paragraph also contained the statement—"(See Article 15 of the Contract.)"

■ When the formal contract was prepared for execution, the contracting officer inserted certain provisions under Article 22, entitled "Alterations", in which Articles, 3, 9, 18 and 19 of the Contract were changed and a new Article 23, "Termination for the Convenience of the Government," was added. In addition, this article stated that the specifications were changed by adding thereto paragraph 2–26, changing paragraphs 2–19 and 2–16, and deleting paragraph 2–22. As re-written, paragraph 2–16 provided for appeals to the Secretary of War instead of to the Chief of Engi-

neers, and left out the parenthetical reference to Article 15 of the contract. However, for the reasons above mentioned, we think the elimination of the reference to Article 15 did not have the effect of changing the substance and meaning of the original paragraph 2–16 as to the extent of the finality of the decisions of the contracting officer and the head of the department. We are also of the opinion that the making of this change in paragraph 2–16 of the Specifications under Article 22, did not have the effect of changing in any way Article 15 of the Contract. This could only have been accomplished by expressly changing or deleting and rewriting Article 15, as was done with reference to certain other articles of the Contract.

■ The decision of the Board of Contract Appeals was based upon its interpretation of the contract documents which is not a question of fact within the meaning of Article 15. Pfotzer v. United States, supra. In view of the facts and for the reasons hereinbefore discussed, we hold that the Board and the Secretary of War erred in denying the claim here involved.

We conclude, therefore, that plaintiff's contract, specifications and drawings did not require plaintiff to grade the airfield taxiway on the Midwest Air Depot site west of property line Range 29, and that there was nothing in the contract, specifications, or drawings furnished to plaintiff to call plaintiff's attention, before it made its bid, to defendant's undisclosed intention to include the taxiway in question within the assembly plant site grading project.

There remains the question of damages.

■ Plaintiff contends that 84 cents per cubic yard is the proper measure of compensation for the grading west of Range 29. Defendant contends that 84 cents is excessive and that in any event plaintiff has failed to prove any damages. Plaintiff kept a record of its costs for this extra work as it was performed and introduced evidence showing its total actual cost for all the work done west of Range 29, exclusive of profit and overhead, in the amount of $158,235.94 (finding 22). Defendant has no evidence to show that these costs were erroneous or excessive for the work done.

This cost, without profit and overhead expense, amounts to about 53 cents a cubic yard which, we think, was reasonable in the circumstances. The defendant, however, takes exception in its brief to the amount of the item for equipment rental. Some of the machinery on which rental as a part of cost or compensation for the extra work was charged, was owned by plaintiff and some by the Government. The plaintiff paid a certain rental rate to the Government for the machinery rented from it and charged the same rate on its books for machinery plaintiff owned and used for this work. Defendant objects to this procedure on the ground that there was no proof as to what plaintiff's ownership costs were nor how much of the total rental paid was paid to the Government for rental of its machinery. From the record we are convinced that the rental figures claimed by plaintiff for various items of machinery and equipment were fair and reasonable and that they were not more than the Associated General Contractor rates customarily charged. Defendant offered no evidence to support its contention that the rental rates were not reasonable.

. Plaintiff's actual costs of $158,235.94 do not include anything for overhead or profit. The actual cost per cubic yard for this extra work was approximately 53 cents. We believe that 59.3 cents per cubic yard, which would include a reasonable amount of 12 percent additional for overhead and profit, constitutes reasonable and fair compensation to plaintiff for such work. In view of plaintiff's actual costs of performing certain grading work northwest of Range 29 and within the Midwest Air Depot site, which the War Department Board of Appeals held to be extra work outside of plaintiff's contract, the contracting officer paid plaintiff 60 cents a cubic yard. Accordingly, we are of opinion that plaintiff is entitled to recover $105,502.17, representing the difference between $177,231.-69 (298,793 cu. yds. at 59.3 cents) and $71,729.52 (298,473 cu. yds. at 24 cents), which plaintiff has already been paid.

Plaintiff claims interest, but interest is not allowable on the judgment at this stage of the case under Sec. 2516, U.S.C.A. Title 28, Revised.

Judgment will be entered in favor of plaintiff for $105,502.17. It is so ordered.