Laramore, Judge,
delivered the opinion of the court:
Plaintiff sues to recover the difference in dollars between the overhead rate as fixed in a “time and material” contract and the overhead rate actually encountered during performance thereof.
On June 15, 1952, plaintiff and defendant entered into a time and material contract for the changing and conversion of drawings and parts lists maintained by defendant at its Detroit Arsenal on automotive equipment. A time and material contract was entered into because the number of drawings and parts lists involved were not ascertained, nor could an accurate estimate be made except at a prohibitive cost.
*106 At the time the contract was negotiated and signed, it was contemplated by the defendant that the project would be one of total conversion which would include all drawings and parts lists at the Detroit Arsenal relating to automotive equipment. After the work had been in progress for several months it became evident that many of the drawings were obsolete. It was thereupon determined that such drawings would be eliminated. Accordingly, by letter dated March 17, 1958, the contracting officer issued a directive changing the program from a policy of total conversion to one of selective conversion. This necessarily created a reduction in volume.
The contract provided for a maximum of $5,000,000 to be expended on the project. However, the total amount actually expended was $3,371,980.43. It is as a result of this curtailed expenditure that the plaintiff alleges his overhead expenses were proportionately increased. On March 15, 1954, plaintiff presented a claim for an adjustment in the overhead percentage fixed in the contract. This request was denied by the contracting officer in a letter dated March 31, 1954.
On April 27, 1954, plaintiff appealed to the Secretary of the Army from the decision of the contracting officer. This appeal was denied by the Armed Services Board of Contract Appeals by decision dated July 21,1955.
On November 23, 1955, plaintiff filed its petition in this court and the case was referred to a trial commissioner. By agreement of the parties, and with the approval of the commissioner, the trial was limited to the issues of law and fact relating to the right of the plaintiff to recover.
When a contractor enters into a time and materials contract he agrees to furnish the labor and equipment necessary to fulfill his obligations at a prescribed rate. The rate to be charged for direct labor can be precisely predetermined at an hourly rate or any acceptable measurement. However, the rate for nonproduction personnel such as owners, officers, clerical workers, salesmen, and others must of necessity be estimated. This rate is referred to as overhead or burden rate. It is reasonable to assume that this rate is not merely conjecture but is determined by some intelligent process. *107 Plaintiff alleges, and the commissioner so found, that in this instance the contractor relied on the volume of work anticipated in the project. The Arsenal personnel orally informed representatives of the plaintiff that it was expected to be a five million dollar program. The plaintiff estimated that up to that time in the year his burden rate was 32 percent. Based on the increased volume of work anticipated under the proposed contract, the plaintiff calculated that he could perform the work at a burden rate of 25.97 percent, and submitted his bid accordingly. It is apparent that in accepting a bid that included a lower burden rate, the defendant was placed in a better position than it would have been in had the contract provided for a burden rate of 32 percent. Defendant admits as much but contends that the plaintiff is bound by the terms of the written contract. Admittedly, defendant may not have accepted plaintiff’s bid had it contained a burden rate of 32 percent, but that is not the issue. The only issue to which this court addresses itself is whether the unilateral reduction in the volume of work under the terms of a partially executed contract creates liability in the party ordering the reduction if it results in increased costs to the other party. We are of the opinion that it does. This Court has previously held that the Government is liable for increased costs resulting from a change in volume from the estimated volume given to the contractor as a basis for computing its bid. In Fehlhaber Corporation v. United States, 138 Ct. Cl. 571, 584 (1957), cert. denied, 355 U.S. 877, we stated:
* * * Plaintiff had a right to rely on the Government’s specifications and drawings and the Government is bound by any assertions made therein notwithstanding the fact that it was stated that that data would be for information only.
Perhaps a case more factually similar to the instant case is Peter Kiewit Sons' Company v. United States, 109 Ct. Cl. 517 (1947). In that case, plaintiffs were three contractors who entered into a contract for the grading of runways at an airfield. Tremendous amounts of fill were required for the grading. This fill was to be obtained from three areas in the following amounts: area one, 700,000 cubic yards; area *108 two, 1,600,000 cubic yards; area three, 2,300,000 cubic yards. The plaintiffs prepared their estimate on that volume with a different price for each area. The prices computed by the plaintiffs were 31.392, 51.23, and 29.77 cents per cubic yard respectively. Plaintiffs were then advised that a composite bid for the three areas would have to be submitted. They then computed a weighted average and arrived at a price of 37.476 cents per cubic yard. It is readily apparent that the contractor stood to profit from areas one and three but would lose money on area two. While the work was in progress the Government notified plaintiffs that the amount of fill from area three would be reduced by 750,000 cubic yards. The plaintiffs complained that this would increase their unit costs and that an equitable adjustment should be made on the contract. This court agreed. In other cases, Ruff v. United States, 96 Ct. Cl. 148 (1942); Virginia Engineering Co., Inc., v. United States, 101 Ct. Cl. 516 (1944); Loftis v. United States, 110 Ct. Cl. 551 (1948), to cite but a few, the court allowed recovery where there was a mistake either by the Government or by both. In the instant case there was no mistake. Instead, there was a unilateral reduction in volume by the defendant for its own purpose. The defendant clearly had the right to make this reduction under the terms of Section 2 of the standard Government supply contract (finding 28) but they are obliged to pay for increased costs occasioned by the change.
The defendant argues that the plaintiff may not recover because it has failed to prove that it sustained a loss. We find this argument devoid of merit. If a contractor bids on a contract intended to provide a million dollars in profit but because of some unilateral action on the part of the other party he, in fact, makes a profit of 50 cents, can it be denied he was damaged even though clearly he realized a profit ? It is in regard to this damage we direct the question of liability. There can be liability even though the contractor has actually realized some profit rather than an actual loss.
Defendant further contends that the plaintiff should be denied recovery for failure to exhaust his administrative remedies for two reasons. First, the plaintiff failed to present a claim for adjustment to the contracting officer within *109 tbe 30-day period allowed by the changes clause of the contract (finding 7(c)). Second, plaintiff is presenting a new theory for recovery which was not considered by the Board.
In considering defendant’s first contention it must be conceded that plaintiff was notified of the change by directive dated March 27,1953, and that they did not present their request for an adjustment until March 15, 1954. However, even though plaintiff knew that defendant intended to change from a program of complete conversion to one of selective conversion, it is not shown that they were aware that this would result in less than five million dollars being spent on the project. When it became evident that less would be expended, they promptly presented a claim for adjustment which was denied. A timely appeal was then made and it produced the same result.
The defendant then contends that the plaintiff’s theory of recovery before the Board was based on the mutual mistake of the parties and that a new theory, not available to the Board, is being presented here, thus determining that plaintiff has failed to exhaust his administrative remedy. This argument has been before at least one District Court and this court on previous occasions with conflicting results. In the District Court it has been held that the review by that court shall consist solely of a review of the administrative record and not a trial de novo. Mann Chemical Laboratories, Inc. v. United States, 174 F. Supp. 563. However, it has been consistently held in this court that a review of an administrative decision shall not be limited by a review of the record, as it appeared before the agency, but that additional evidence may be presented in a trial de novo. Volentine and Littleton v. United States, 136 Ct. Cl. 638 (1956) ; Fehlhaber Corporation v. United States, supra. Our position since these decisions has never wavered, as we explained in Carlo Bianchi and Company v. United States, 144 Ct. Cl. 500, 506:
In our opinion in Volentine and Littleton v. United States, 145 F. Supp. 952, 136 Ct. Cl. 638, holding that the trial in this court should not be limited to the record made before the contracting agency, but should be de novo, we recognized that there were logical weaknesses *110 in our position. We concluded, however, that the intent of Congress in enacting the Wunderlich Act was in accord with our conclusion, and we adhere to that conclusion in this case.
By stipulation, this proceeding has been limited to the decision of the question of liability. Our conclusion is that, as the result of the very substantial curtailment of volume which resulted in increased overhead costs to the plaintiff, the defendant is liable. Judgment will be entered to that effect. The amount of the plaintiff’s recovery will be determined pursuant to Eule 38(c) of the Eules of this court.
It is so ordered.
Peed, Justice (Bet,), sitting by designation; Dukfee, Judge,; MaddeN, Judge; and Jones, Chief Judge, concur.
FINDINGS OE FACT
The court, having considered the evidence, the report of Trial Commissioner Mastín Gb White, and the briefs and argument of counsel, makes findings of fact as follows:
1. By agreement of the parties, and with the approval of the commissioner, the trial was limited to the issues of law and fact relating to the right of the plaintiff to recover. The determination of the amount of recovery and the amount of offsets, if any, was reserved for further proceedings.
2. The plaintiff is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal office in Philadelphia.
3. During the latter part of the fiscal year 1952, officials of the Detroit Arsenal, Department of the Army, decided to procure engineering services for the purpose of inaugurating and carrying forward a project for the rehabilitation, correction, and drawing-number conversion of drawings and parts lists maintained by the Detroit Arsenal on automotive equipment, in order to provide a uniform 7-digit numerical numbering system for such materials. No one knew, and there was no feasible way of ascertaining, the precise number of the drawings and parts lists that would be involved in the program, or the amount of work that would be required in order to carry out the program. Officials of the Detroit Arsenal preferred to begin experimentally with a *111 time-and-material contract that would have a $1,000,000 ceiling price. However, they were advised by an official of the Office of the Chief of Ordnance that, since ample funds for such a project were available in the then current fiscal year (which was drawing to a close) and it was not known whether any money would be available for that purpose thereafter, they should enter into a time-and-material contract with a ceiling price sufficiently high that it could reasonably be expected to cover the entire cost of the project. Acting on that advice, officials of the Detroit Arsenal requested an authorization, which was granted by the Chief of Ordnance, for entering into a 2-year time-and-material contract with a ceiling price of $5,000,000.
4. (a) An invitation for bids on the proposed contract referred to in finding 3 was issued by the Detroit Arsenal under the date of May 7,1952. A copy of the invitation was furnished to the plaintiff. It stated in part as follows:
You are requested to submit a proposal (in triplicate) to the attention of the undersigned no later than 18 May 1952 for the furnishing of engineering services.
Your quotation will be submitted in the form of a straight time hourly rate and an overtime hourly rate. The straight time hourly rate will be based upon performance for a forty (40) hour week. It will be broken down to set forth your anticipated direct labor, burden and profit factors. The overtime rate will be based upon performance in excess of eight (8) hours in any one work day or forty (40) hours in any one work week. This rate will also be broken down as to direct labor costs, burden and profit factors. It is to be pointed out that this will result in a time and material contract and that the profit factors on such a contract are generally limited at a profit not more than 6%. It is requested that insofar as possible your burden factors should be broken down to show the direct burden and general administrative expense.
It is the intention of the Government to enter into a contract with a facility_ for drawing and part number conversion. It is anticipated that this work will encompass the following types of engineering services:
a. The conversion of approximately 701,000 drawings and parts lists presently in possession of the Engineering Service Division, Detroit Arsenal, from “old style” part and drawing numbers to the newest part and draw *112 ing numbers by methods shown in Ordnance Corps Drafting Eoom ^Regulation and as supplemented by instructions from the Contracting Officer or his duly authorized representative.
b. Change drawing numbers on approximately 140,000 drawings.
c. Change approximately 250,000 part numbers appearing on 10,000 tabulated drawings.
d. Prepare approximately 50,000 Stock Deference drawings for numbers which have been assigned but for which there is presently no drawing support.
e. Prepare approximately 250,000 dummy drawings.
f. Change and convert approximately 50,000 “old style” numbers appearing on current assembly drawings.
g. Change and convert approximately 50,000 parts lists of “old style” numbers.
h. Add ordnance corps numbers to approximately 101,000 commercial reproducible prints.
(b) Attached to the invitation for bids was a supplementary document dealing with the subject of “Scope of Contract.” This document stated (among other things) that “The total amount to be paid the Contractor shall not exceed Five Million Dollars ($5,000,000.00) (ceiling price),” and in another place that “The total amount of this contract shall not exceed the amount of Five Million Dollars ($5,000,000.00).” It also indicated that performance of the work would extend over a 2-year period.
(c) The statistical data set out in the invitation for bids as approximations respecting the items of work to be accomplished were the best estimates that could be made by the personnel of the Detroit Arsenal.
5. (a) After the plaintiff received the invitation for bids referred to in finding 4, representatives of the plaintiff conferred with personnel of the Detroit Arsenal concerning the proposed project. The Arsenal personnel orally informed representatives of the plaintiff that the statistical data set out in the invitation as approximations on the prospective volume of work represented estimates of what would be required in the performance of the proposed contract, and that it was expected to be a $5,000,000 program. However, such statements by Arsenal personnel did not purport to be, and were not understood by the plaintiff’s repre *113 sentatives to be, a firm commitment or guarantee respecting the scope of the proposed project.
(b) It was not feasible for representatives of the plaintiff to ascertain for themselves the number of items of work on hand at the Detroit Arsenal for processing under the proposed contract.
6. After conferring with personnel of the Detroit Arsenal, the plaintiff prepared and submitted under the date of May 16, 1952, a proposal to the Arsenal in response to the invitation for bids. This proposal quoted (among other things) composite rates for direct labor of $2.13 per man-hour on straight-time work and $3.02 per man-hour on overtime work, and a burden (or overhead) rate of 25.97 percent of the charges for direct labor. The burden (or overhead) rate was computed by the plaintiff on the basis of an expectation that the volume of work to be performed under the contract would conform approximately to the statistical estimates set out in the invitation for bids, and that such volume of work would require direct labor aggregating a total of approximately $3,600,000 during the 2-year life of the contract. At the time when the plaintiff’s proposal was submitted, the plaintiff’s accumulated burden (or overhead) rate for the then current year, on the basis of the volume of work handled by the plaintiff up to that time in the year,[2] was approximately 32 percent. The plaintiff believed, however, that a rate of 25.97 percent would cover its overhead costs in performing the much larger volume of work anticipated under the proposed contract.
7. (a) Following some further negotiations between representatives of the plaintiff and personnel of the Detroit Arsenal, a contract (numbered DA-20-089-ORD-35385) was entered into as of June 15,1952, between the plaintiff and the defendant (represented by a contracting officer assigned to the Detroit Arsenal). The negotiations mentioned in the preceding sentence included (among other things) a discussion of the plaintiff’s proposed burden (or overhead) rate of 25.97 percent. The representatives of the plaintiff explained the basis on which such rate had been computed; *114 and no objection to the proposed rate was interposed by personnel of the Detroit Arsenal.
(b) The contract, which was designated as a “Time and Material Contract,” contained the following special provisions (among others):
1. The Contractor, in coordination with the Contracting Officer and/or his duly authorized representative, shall:
a. Provide appropriate facilities in the Detroit area, at a distance not greater than twenty (20) miles or forty-five (45) minutes from the Detroit Arsenal, for the conversion of Ordnance drawings and parts lists as furnished by the Engineering Service Division, Development and Engineering, which work will include the following: (1) Maintain and establish engineering and control files, (2) Contractor shall be required to obtain commercial and Ordnance design engineering information as required, (3) Convert Ordnance assembly, detail, and component drawings with “old style” drawing numbers to new and assigned drawing numbers, (4) Eliminate commercial drawing numbers, company names and proprietary designations and substitute therefore [sic] Ordnance Corps drawing numbers and designations, (5) Contractor shall be required to revise, and/or heavy up and darken and/or redraw any drawings as referred by the Contracting Officer, (6) Analyze and prepare stock reference drawings for numbers for which there is presently no drawing support, (7) Contractor shall check all work performed to assure that it is in accordance with marked prints, (8) Eeview existing parts lists and stock reference lists and correct each by replacing all parts numbers with the newly assigned numbers. New assigned numbers shall be designated for parts for which there are no existing number or presently existing “old style” numbers, (9) Maintain complete and accurate record of all performance accomplished on this contract, and (10) Contractor shall do/or perform any/or all additional services as requested by the Contracting Officer or his duly authorized representative.
* ❖ * * #
12. Performance of the work required of the Contractor shall commence 1 July 1952 and shall be completed on or before 1 July 1954, or such other date as must be agreed upon by the parties hereto.
«ÍC 5}« »}• ^4
*115 14. In consideration of the work performed the Contractor shall be paid as follows:
a. Straight Time — $2.04 per hour for each man hour of direct labor performed by any one (1) man up to eight (8) hours m any one (1) work day or forty (40) hours in any one (1) work week.
b. Overtime — $2.93 per hour for each man hour of direct labor worked in performance of this contract by any one (1) man in excess of eight (8) hours any one (1) work day or forty (40) hours straight time in any one (1) workweek.
c. The total amount to be paid the Contractor shall not exceed Five Million Dollars ($5,000,000.00). All rates subject to 1% Discount 30 Days.
* H? # * *
16. The above rate shall be paid for each hour of direct labor coming within the following classifications of labor: Checkers, draftsmen, parts specialists, stenographers, typists and clerks performing direct labor on contract, liaison personnel while in Government installations or such other sources as may be designated by the Contracting Officer securing engineering information and general data relating to the work. * * *
17. The time of non-production personnel will not be included as direct labor. The term “non-productive” personnel shall be deemed to include without limitation, owners, partners, officers, supervisors, foremen, office clerks, office typists, timekeepers, material handlers, stock-room employees, tool crib attendants, cleaners, janitors, maintenance men, painters, Watchmen, truck drivers, receiving and shipping employees, blueprint machine operators, salesmen and office personnel.
* * # ^ H*
22. The Contractor shall be paid semi-monthly for the time spent in the performance of the contract, upon submission of properly certified invoices or vouchers, the prices as determined above.
* * Ü! * #
27. Kate Negotiations
a. Because of the protracted period of time over which performance of this contract will extend, namely twenty-four (24) months, and due to the present fluctuating economy of the country, the parties agree that the rates provided in Paragraph No. 14 herein, may be increased or decreased in accordance with the provisions of this paragraph.
* * $ $
*116 d. The parties to this agreement do hereby mutually agree that the burden rate throughout the performance of this contract shall be 25.97% and that this rate shall be fixed and not subject to review for rate renegotiation. This rate is established by previous audited experience of the H. L. Yoh Company and the Contractor warrants that said burden rate fairly and accurately represents its burden cost factor performance experienced on previous Government contracts of this nature. % * * * *
28. The total amount of this contract shall not exceed the amount of Five Million Dollars ($5,000,000.00).
(o) In addition to the provisions set out above, the contract contained certain general provisions that are standard parts of Government supply contracts. Among these were articles dealing with the subjects of “changes” and “disputes,” as follows:
2. CHANGES
The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in any one or more of the following: (i) drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be asserted within 30 days from the date of receipt by the Contractor of the notification of change: Provided, however, That the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under this contract. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled “Disputes.” However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.
♦ it * * *
*117 12. Disputes
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce Iris decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive: Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
(d) Paragraphs 1-a and lh-c of the special provisions were revised by means of a Second Supplemental Agreement, which the parties entered into on December 1, 1952. However, neither of these changes was significant from the standpoint of the issues involved in the present litigation.
(e) Paragraphs 14-a and 14-b of the special provisions were revised by means of a Third Supplemental Agreement, which was entered into between the parties on January 1, 1953; were revised again by means of a Fourth Supplemental Agreement, which was entered into between the parties on July 1, 1953; were revised again by means of a Fifth Supplemental Agreement, which the parties entered into on September 3, 1953; and were revised again by means of a Sixth Supplemental Agreement, which was entered into between the parties on December 18, 1953. However, none of these changes was significant from the standpoint of the issues involved in the present litigation.
8. (a) At the time when the contract mentioned in finding 7 was negotiated and signed, it was the intention of the Detroit Arsenal that the conversion program under the contract would include all drawings and parts lists at the Detroit Arsenal relating to automotive equipment; and for a *118 number of months after performance under the contract began, drawings and parts lists were furnished by the Detroit Arsenal to the plaintiff for processing in accordance with the plan of total conversion. After the work had been in progress for a number of months, however, the Detroit Arsenal decided that it would be advisable to eliminate from the program thereafter all items relating to obsolete equipment. This change was inaugurated by means of a letter dated March 27,1953, from the Detroit Arsenal to the plaintiff. Subsequently, only those drawings and parts lists relating to automotive equipment in active use were furnished by the Detroit Arsenal to the plaintiff for processing under the contract.
(b) The plaintiff did not, within 30 days from the date of the receipt of the Detroit Arsenal’s communication dated March 27, 1953, assert a claim for an adjustment under the “changes” article of the contract because of the change in the scope of the program from total conversion to selective conversion.
9. The plaintiff performed the services required of it under the contract and received payment therefor.
10. The number of items of work furnished by the Detroit Arsenal to the plaintiff for processing under the contract during its 2-year life was substantially less than the number of items that had been referred to in the invitation for bids as approximations; the handling of the actual volume of work involved charges for direct labor that aggregated substantially less than the total of approximately $3,600,000 anticipated by the plaintiff; and the plaintiff’s overall earnings under the contract (including the allowance for overhead at the burden rate of 25.97 percent fixed in the contract) amounted only to $3,371,980.43, which was substantially less than the plaintiff had expected to receive. This decrease in the volume of work and in the amount of earnings below the levels which the plaintiff had anticipated was attributable, at least in part, to the action of the Detroit Arsenal in shifting from a program of total conversion to one of selective conversion, as mentioned in finding 8.
11. The evidence does not show that the plaintiff lost money in performing the contract, or that the allowance for overhead received by the plaintiff at the contractual rate of *119 25.97 percent was insufficient to cover the plaintiff’s actual overhead costs incurred in performing the contract.
12. In the performance of a contract that calls for the processing of materials or the furnishing of services, the percentage rate of the contractor’s overhead costs, in relation to the direct-labor costs, will ordinarily be affected by the volume of the work, the overhead percentage rate decreasing as the volume of work increases. Hence, it is reasonable to infer that if the plaintiff had known, at the time when this contract was being negotiated, that the volume of the work to be furnished by the Detroit Arsenal for processing under the contract would involve direct-labor charges falling substantially below the $3,600,000 level, the plaintiff would have proposed for inclusion in the contract a burden (or overhead) rate higher than 25.97 percent.
13. (a) Under the date of March 15, 1954, the plaintiff addressed to the commanding officer of the Detroit Arsenal a letter asserting “a claim for an adjustment in overhead based on change of scope.” The claim was in the amount of $112,165.42, and the plaintiff stated that this was “the amount the contractor has lost for the first eighteen months of operation under the contract because of the fact that the workload as described as $5,000,000 could not be performed due to the fact that the Arsenal did not release the work as described under the contract and did not consequently permit the contractor to furnish the required personnel.”
(b) On March 31, 1954, the contracting officer responded to the plaintiff’s letter of March 15, 1954. In his communication, the contracting officer determined (among other things) that “The Contract contained a fixed burden rate of 25.97% which continued during the life of the Contract and was not subject to review or adjustment”; and “That the Contractor is not entitled to any part of the sum of One Hundred Twelve Thousand, One Hundred Sixty Five and 42/100 Dollars ($112,165.42) claimed for the alleged reason that the actual workload did not equal the estimate thereof.”
(c) Under the date of April 27, 1954, the plaintiff addressed an appeal to the Secretary of the Army from the determination of the contracting officer. The plaintiff stated (among other things) that “This appeal is taken *120 pursuant to the provisions of Section 12 of the General Provisions of the said contract.”
(d) The plaintiff’s appeal was denied by the Armed Services Board of Contract Appeals (acting for the Secretary of the Army) in a decision dated July 21, 1955.[3] In its opinion, the ASBCA stated (among other things) that “The record is devoid of any evidence that tire project as contemplated was changed in a manner so as to give the contractor any rights under the standard ‘Changes’ article which was included in the contract along with the other customary provisions.”
14 Thereafter, the plaintiff’s petition was filed with this court on November 23,1955.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment will be entered to that effect.
The amount of recovery will be determined pursuant to Buie 38 (c) of the Buies of this court.
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on December 1, 1961, that judgment for plaintiff be entered for $73,000.

 The extent of the plaintiff’s volume of work during the period mentioned is not shown by the evidence.

 The amount of the plaintiff’s claim was Increased to $121,399.14 during the course of the proceedings at the departmental level.