**MORRISON–KNUDSEN COMPANY, Inc.**
v.
**The UNITED STATES.**
No. 239–61.

United States Court of Claims.
June 14, 1968.

John A. McWhorter, Washington, D. C., for plaintiff. John W. Gaskins, Washington, D. C., attorney of record. King & King, Washington, D. C., of counsel.

Edward J. Friedlander, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant. Edwin J. Reis, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to then Trial Commissioner Herbert N. Maletz (now a Judge of the United States Customs Court) with directions to make recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on June 20, 1967, wherein facts necessary to the opinion and recommended conclusions are stated. Defendant filed exceptions to the commissioner's recommended conclusions, except as to those conclusions relating to

the finished tolerances of the subgrade of the road,* and the case has been submitted for review by the court on the briefs of the parties and oral argument of counsel.

■■ With respect to the first claim (based on the relocation of the borrow pits), the court stresses, as did the commissioner, the inclusion in this contract of the mandatory standard Changes article with its broad and general reach. We have repeatedly indicated that, where that (or a comparable) clause is contained in a contract, the court will construe the agreement, to the extent it is fairly possible to do so, so as not to eliminate the standard article or deprive it of most of its ordinary coverage. United Contractors v. United States, 368 F.2d 585, 598, 177 Ct.Cl. 151, 165–166 (1966); Thompson Ramo Wooldridge, Inc. v. United States, 361 F.2d 222, 228, 175 Ct. Cl. 527, 536 (1966); Farnsworth & Chambers Co. v. United States, 346 F.2d 577, 580–581, 171 Ct.Cl. 30, 35 (1965); Jack Stone Co. v. United States, 344 F.2d 370, 374–375, 170 Ct.Cl. 281, 288 (1965); Kaiser Industries Corp. v. United States, 340 F.2d 322, 329–330, 169 Ct.Cl. 310, 323–324 (1965); Fehlhaber Corp. v. United States, 151 F.Supp. 817, 825, 138 Ct.Cl. 571, 584 (1957), cert. denied, 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed.2d 108; Loftis v. United States, 76 F.Supp. 816, 825–826, 110 Ct.Cl. 551, 627–629 (1948); Pfotzer v. United States, 77 F.Supp. 390, 399, 400, 111 Ct.Cl. 184, 226, cert. denied, 335 U.S. 885, 69 S.Ct. 237, 93 L.Ed. 424 (1948). The defendant says that here it attempted to cast the whole risk of borrow pit location on the contractor, but if that was its purpose it should have sought permission to delete the mandatory Changes article or to substitute a more limited form of the clause. So long as the Changes article in its normal form is included in a contract, the court is justified in reading the specifications, if reasonably possible, to harmonize and not conflict with that standard clause. That is what the commissioner has done in this case, and we think correctly so.

Since the court is in agreement with the opinion and recommended conclusions of the trial commissioner, with minor modifications, it hereby adopts the same, as modified and as supplemented by the preceding paragraph, as the basis for its judgment in this case, as hereinafter set forth.

As to the claim based on relocation of borrow pits (treated as Claim I in the opinion), plaintiff is entitled to an equitable adjustment under the Changes clause (on its own behalf and on behalf of its subcontractor) for all the increased costs resulting from the changes in question, which amount (to prevent double recovery) is to be reduced by $16,097 for the compensation plaintiff has already received for the overrun in overhaul. Judgment to this extent is entered for plaintiff with the amount of recovery to be determined in the first instance (if the parties do not agree) by the Board of Contract Appeals of the Department of the Interior.

As to the claim related (in part) to deletion of selected borrow surface course (treated as Claim II, Item 1 in the opinion), plaintiff is entitled to an equitable adjustment under the Changes clause (on its own behalf and on behalf of its subcontractor Edwards) for the additional costs resulting from the directions of the commission which required use of oversized materials in constructing the top 12 inches of the subgrade. Judgment to this extent is entered for plaintiff and in the absence of agreement by the parties, the amount of recovery will be determined in the first instance by the Board of Contract Appeals of the Department of the Interior.

As to the aspect of plaintiff's claim which is treated as Claim II, Item 2 in the opinion, it is concluded that plaintiff is not entitled to recover and the petition relating to recovery therefor is dismissed.

* The plaintiff did not except to the commissioner's adverse recommendation on that issue.

As to the claim for increased costs resulting from shut-down for the winter of 1954–55 (treated as Claim III in the opinion), plaintiff is entitled to recover for the salary paid to the project superintendent during the shut-down period (plus payroll taxes and insurance thereon), the labor and equipment costs it incurred in demobilizing its equipment spread at the end of the 1954 season and remobilizing it at the start of the 1955 construction season, and the ownership expense of maintaining in storage during the shut-down period the specific items of equipment required to complete the project. Judgment to this extent is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 47(c).

As to those two portions or aspects of plaintiff's claims treated as Claim I and Claim II, Item 1 in the opinion, proceedings are suspended for a period of 90 days from the date hereof in order that the case may be returned to the Board of Contract Appeals for the Department of the Interior for determination in the first instance of the amount of recovery (if the parties do not agree thereon). Plaintiff is to comply with appropriate provisions of the General Order of April 1, 1968, implementing Rule 100 in advising the court of the status of such proceedings.

Commissioner Maletz' opinion, with minor modifications by the court, is as follows:

## OPINION OF COMMISSIONER

MALETZ, Commissioner:

This is a suit on a contract between plaintiff and the Alaska Road Commission of the Department of the Interior (hereafter referred to as the commission) for the grading, drainage and related construction work required to improve a 45-mile segment of an existing roadway which extended from Valdez to Fairbanks in the then Territory of Alaska. The 45-mile segment, otherwise identified as section G of the Richardson Highway, extended from milepost 35.9 to milepost 82.1 and was located about 250 miles from Anchorage. The consideration for performance of the work was $2,083,853, based upon unit prices for estimated quantities of the various types of required construction work.

The contract was signed in April 1953 and was completed in the spring of 1955 within the contractual time limit as extended. It called for the construction of highway improvements from excavated and borrow material[1] and the placing of a subgrade. Suitable material was to be conserved for constructing the top portion of the subgrade and no rocks or hard lumps that could not readily be broken up into pieces not over six inches in diameter were to be placed in the upper 12-inch layer. Originally the contract also called for placing on top of the subgrade a selected borrow surface course consisting of a six-inch thick layer of finer material not greater than one and one-half inches in diameter.[2] However, in April 1954, about a year after the contract was signed, the selected borrow surface course was deleted by the commission and all preparatory work incident thereto ordered halted because of serious overruns in probable costs.

Under the contract, the contractor was not to be paid directly for preparing the subgrade or the selected borrow surface course. These items, instead, were subsidiary obligations of the contractor who

1. In constructing a highway improvement such as the one here, changes in elevation of existing terrain must be made by cuts and fills before a relatively level riding surface can be obtained. The cuts are made by excavation, and the fills are constructed by using both excavated and/or borrow material.

2. The nature of the work was to be clearing, grubbing, excavation, placing excavated materials in the embankments or wasting excavated materials as determined in the field, the opening up of borrow pits, the loading, hauling and placing of borrow material into a subgrade and the application of the six-inch selected borrow surface course to the entire 45-mile section.

was paid on the basis of the number of units of service or material actually employed by the contractor on the job. This is illustrated by the following excerpts from the contract schedule showing the estimated quantities of major items of work to be performed, their identifying numbers, the unit prices bid thereon by plaintiff, and the estimated cost of each item:

| Item No. | Estimated quantity | Description | Unit bid price | Amount bid |
|---|---|---|---|---|
| 24(2)–1 | 227,000 | Cu. Yds., Unclassified Excavation, Unit A. | $1.40 | $317,800.00 |
| 24(2)–2 | 441,000 | Cu. Yds., Unclassified Excavation, Unit B. | .70 | 308,700.00 |
| 24(2)–3 | 103,000 | Cu. Yds., Unclassified Excavation, Unit C. | 1.00 | 103,000.00 |
| 26(1) [3] | 742,000 | Excavation for Borrow | .73 | 541,660.00 |
| 28(2) [4] | 345,000 | Cu. Yd., Mi. Special Overhaul of Borrow (1000′ free haul). | .27 | 93,150.00 |
| 100(1) | 175,000 | Cu. Yds., Selected Borrow Surface Course. | 1.20 | 210,000.00 |
| 310(1) | 11,500 | Cu. Yds., Loose Riprap | 9.00 | 103,500.00 |

Three claims are involved in the present action. In the first claim plaintiff seeks review of a decision by the Interior Department Board of Contract Appeals (IBCA–50) denying (in major part) its request for an equitable adjustment under the Changed Conditions or Changes clause of the contract arising as a result of the relocation of borrow pits. As to this claim, plaintiff contends that during performance of the work it and its subcontractor encountered subsurface and/or latent conditions in borrow pits designated by the commission which differed materially from those shown on the drawings and that the board erred in not granting an adjustment for a changed condition. Alternatively it is contended that the commission (i) designated substitute borrow pits to replace the originally designated pits that failed in whole, or in part, to yield the designated quantities of borrow; (ii) ordered certain of the original borrow pits enlarged; and (iii) ordered plaintiff to perform overhaul of borrow without regard for the fixed station points (or balance points) designated on the drawings and without regard for its effect upon plaintiff's equipment spreads. Plaintiff ar-

3. Item 26(1) consisted of excavating approved material from borrow pits when sufficient quantities of suitable materials were not available from other materials, and the disposing of all excavated materials, all in accordance with the plans and specifications or as directed by the commission engineer (hereafter referred to as the engineer)—the authorized representative on the job of the contracting officer. See specifications FP–41, articles 26–1.1, 1.16. Both the contract specifications (Item 28) and the drawings (Sheet 3) specified that the borrow involved in this item was to be case 1 borrow, which is to say that the sources of borrow material were to be indicated on the plans and/or designated by the engineer. See article 26–1.3. Article 26–2.1 of the specifications provided (i) that the material for this item was to be material selected by the engineer as meeting specifications for the particular embankment or backfill for which the material was intended, and (ii) that the material was to be obtained from the approved borrow sources.

4. Item 28(2) consisted of authorized hauling of borrow in excess of the free-haul distance of 1,000 feet. The number of cubic-yard miles of special overhaul of borrow to be paid for was to be the product of the volume of the overhauled material, measured in its original position in cubic yards by the overhaul distance in miles and fractions thereof. This price was to constitute full compensation for all labor, equipment, tools and incidentals necessary to complete the item.

gues that such action constituted a compensable change and that the board's decision denying it a changes adjustment (except in part) was erroneous.

Plaintiff's second claim is related (in part) to the deletion from the contract of Item 100(1) that called for placing on top of the subgrade a six-inch layer of selected borrow surface course composed of fine material.[5] In this claim plaintiff seeks review of the board's decision (IB CA-36) denying its request for an equitable adjustment under the Changes clause. It contends that the commission (i) both before and after the deletion of the surface course, compelled it to use borrow material containing rocks over six inches in diameter that were unsuitable for use in the top 12 inches of the subgrade; and (ii) after deletion of the surface course, required plaintiff to complete the subgrade to lines and grades without reasonable tolerances and in such a manner that the subgrade would accommodate traffic moving at the rate of 50 miles an hour. Plaintiff says that its costs were substantially increased as a result of the asserted additional requirements imposed upon it by the commission, and that the board decision denying an equitable adjustment was arbitrary and capricious, and unsupported by substantial evidence.

In its third claim, plaintiff alleges that as a result of the disorganization of its operations and the difficulties caused by the relocation of the borrow pits (Claim 1), plus the additional work the commission required plaintiff to perform in the construction of the subgrade (Claim 2), the job was shutdown for the winter of 1954–1955 and completion of the contract was delayed into the year 1955 to plaintiff's damage.[6]

It is in this setting that we now consider each of these three claims on the basis of the record before the board.

## I. Claim Based on Relocation of Borrow Pits

The facts as developed before the board with respect to this claim were essentially undisputed.[7] The bid proposal for the

---

5. Plaintiff was allowed an equitable adjustment by the board for preparatory costs incurred in acquiring equipment to produce material for the surface course. The amount has been paid and is not in dispute here.

6. The three claims in issue were consolidated by the board for hearing and a combined decision was issued on May 27, 1957. A motion for reconsideration was denied on March 23, 1959. Though the board held (IBCA-36) that it had no jurisdiction of the claim for delay incident to the shutdown in winter, it made factual findings on that claim. This court held in a prior proceeding in this case that such findings were gratuitous and did not preclude a trial de novo on the merits. Morrison-Knudsen Co. v. United States, 345 F.2d 833, 838, 170 Ct.Cl. 757, 764 (1965). See also United States v. Utah Construction & Min. Co., 384 U.S. 394, 403–418, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). This court also held in the earlier proceeding that since Claim 2 was fully redressable administratively, that claim had to be determined on the basis of the board record under Wunderlich Act standards. Morrison-Knudsen Co. v. United States, supra, 345 F.2d at 837, 170 Ct.Cl. at 763–764. (Claim 1 was not before the court at that stage.) After

the determination by the court as to the procedures to be followed in respect of Claims 2 and 3, a pretrial conference was held before the late Commissioner McConnaughey (to whom the case was originally assigned) in the course of which the parties agreed "that no trial de novo will be had on any issues relating to liability, and that all further proceedings in this case relating to the issue of liability will be based exclusively on the record of proceedings before the Department of Interior Board of Contract Appeals. * * *"

7. The facts contained in this opinion are derived from unchallenged facts in the board opinion and from undisputed evidence in the board record. See e.g., Olin Mathieson Chemical Corp. v. United States, 179 Ct.Cl. 368, 372, n. 1 (1967); Gholson, Byars and Holmes Constr. Co. v. United States, 351 F.2d 987, 995, n. 7, 173 Ct.Cl. 374, 388, n. 7 (1965). At the pretrial conference before the late Commissioner McConnaughey, the parties agreed that plaintiff (if it chose) might submit here proposed findings of fact based on the evidence before the board as a basis for judgment by the court. Plaintiff, in accordance with such agreement, submitted proposed findings which defendant now asks be disregarded on the ground

project indicated that very substantial quantities of borrowed subgrade material and selected borrow surface course material would be required to supplement the excavation available for construction of the highway. Thus information concerning the location and availability of such borrow material was especially important to the plaintiff in preparing its bid. Such information, together with the various details of construction, was contained in a set of 98 contract drawings which were prepared by the commission on the basis of its field engineering surveys and material studies, and furnished to plaintiff and others as part of the bid proposal. Sheet 1 of the drawings set forth two location maps of the project; Sheet 2 of the drawings contained a typical section of the existing roadway and of the improved roadway to be constructed. Sheet 2 stated that the borrow deposits were shown on Sheet 3 of the drawings and that the grading quantities were shown on the Plan-Profile sheets. Sheet 3 of the drawings contained a borrow location sketch which depicted the sites of 38 designated borrow pits spaced along both sides of the highway and fixed the location of each site with respect to both mile-posts and the project station numbers. Sheet 3 also contained a chart which established for bidders (1) the location of each of the 38 pits by project station number; (2) the specific number of feet that each pit was situated to the left or right of the project station; (3) the corresponding milepost number; and (4) the specific number of cubic

yards of borrow material to be obtained from each pit. Nineteen of the pits were identified with asterisks to indicate "pits suitable for source of Item 100, Selected Borrow Surface Course."

This data was further supplemented by Sheets 4 through 81 of the contract drawings which contained plan and profile drawings of the several segments of the roadway. Fixed stations were designated and in accordance with the note shown on Sheet 2 of the drawings, the following specific information was given regarding the quantities of work to be performed between such stations: (1) excavation in cubic yards; (2) borrow in cubic yards; (3) embankment in cubic yards; (4) overhaul in station yards; (5) borrow overhaul in cubic-yard miles; (6) the specific borrow pit locations, as designated on Sheet 3, from which the quantities of borrow to be used between the fixed stations were to be obtained; and (7) the quantities of unsuitable excavation material that were to be wasted.[8]

All of this information, the record makes apparent, was essential to plaintiff in the preparation and submission of its bid. In advance of bidding, plaintiff's representatives made a physical examination of the work and a visual inspection of the borrow pit materials which revealed nothing from which it could reasonably be foreseen that the areas designated as borrow pits would fail to produce either the quantities of borrow material that were specified in the drawings to be available in each of the pits or the types of borrow material specified in the

that "independent conclusions of fact whether supported by the record or not, are not relevant to the issues." The controversy on this point is academic, however, so far as the present claim is concerned, for the evidence adduced by

plaintiff before the board in respect thereto was essentially undisputed and the board's problem was not one of resolving conflicting testimony but of interpreting various provisions of the contract and specifications.

8. Typical of the information shown upon Sheets 4 through 81 of the drawings is the following from Sheet 46:

| | | | |
|---|---|---|---|
| Excavation | cu. yd. | (3) | 2,529 |
| Borrow | cu. yd. | (2) | 5,315 |
| Embankment | cu. yd. | | 5,502 |
| Overhaul | Sta. yd. | | 0 |
| Borrow O.H. | cu. yd. mi. | | 503 |

(2) From pit mile 60.9.
(3) Waste 967 cu. yds.

contract to be used for the topping layer of the subgrade. From this site inspection and the detailed information furnished on the drawings with respect to the quantities of excavation, borrow, select borrow surface course and waste materials, and overhaul, together with the data relating to the sources of such material for each portion of the work between the indicated stations, plaintiff determined the types of equipment spreads and the size of the work forces that would be required to perform the work most efficiently and economically, and computed its unit prices for each item of the work accordingly. It was important that these determinations be made carefully since the project was 250 miles from Anchorage, the nearest large city, which would serve as a source of both equipment and labor.

The unrefuted testimony before the board established that although the plaintiff placed reliance upon the contract drawings and upon its physical examination of the site, as the work progressed it encountered material variations in the subsurface conditions that had been depicted. Many of the pits, when stripped of top soil and overburden, possessed only a small portion of the quantity of suitable borrow material that the drawings had indicated would be available. Other pits, upon being opened, were ordered abandoned by the commission engineer because they were found to contain material which the engineer classified as unsuitable for borrow. As the board found, of the 29 locations originally designated on the drawings to be used as borrow pits from milepost 51.6 to the north end of the project, 12 pits failed to produce any suitable borrow material; 3 pits failed to yield 30 percent of the quantity designated on the drawings; and 4 pits failed substantially to yield the designated quantities. These deficiencies were overcome in part by the designation of 12 substituted borrow pit locations by the commission engineer, and in part by his directives to enlarge certain of the borrow pits originally designated on the plans which contained a surplus of suitable material.

The uncontradicted testimony also showed that while an experienced contractor such as plaintiff should have anticipated the failure of two or three borrow pits on a project of this size (approximately 10 percent), it was extremely unusual to encounter failure in 65 percent of the designated pits. Such testimony also showed that the information contained on virtually every sheet of the drawings for this portion of the roadway with respect to the sources of borrow material and the quantities of excavation, borrow, embankment, overhaul and borrow overhaul was materially altered.

The undisputed evidence before the board further established that the conditions encountered in the original borrow pits, coupled with the commission's directives, to (1) develop new borrow pits, (2) enlarge the existing pits that contained suitable borrow material, and (3) perform quantities of borrow excavation and haul far in excess of the quantities shown on the plans materially increased plaintiff's and its subcontractor Edwards' borrow operation costs.[9] This was made clear by the testimony of plain-

---

9. Initially plaintiff undertook to perform the approximately 31 miles of road construction from milepost 50.8 to milepost 82.1 with its own forces and entered into a subcontract with McLaughlin, Inc. to construct the 14.9 miles of road between milepost 35.9 and milepost 50.8. The work subcontracted to McLaughlin is not included in plaintiff's claims since the borrow material obtained from the borrow pits adjacent to the first 15-mile segment of the roadway being constructed by that contractor was, with the exception of two borrow pits on the souther-

ly end of the roadway, much finer in quality and well suited for use as a topping material, with the result that it experienced very little difficulty. In or about April 1954, plaintiff entered into a subcontract with Edwards-Nesmith-Ryder (hereafter referred to as Edwards) to construct the portions of the roadway between mileposts 50.8 and 57.4 and between 58.4 and 60.6. These portions of the work were pursued by Edwards until October 10, 1954, when it became insolvent, and the work was completed by plaintiff's own forces. The record is un-

tiff's chief witness who, by means of schedules, illustrated the substantial extent to which daily borrow production (and corresponding revenue) would be reduced when borrow-haul distances were increased. Thus, for illustrative purposes he assumed that a hypothetical tractor scraper spread was used on the job for a nine-hour day. If the borrow haul for that day was 500 feet, a profit of $150.74 would be earned from the operation of the spread. However, if the borrow haul for that day was 3,600 feet, a loss of $942.93 would result from the operation of the same spread.[10]

The contract (Form No. 23) contained standard Changes and Changed Conditions clauses, relevant parts of which are produced below:

ARTICLE 3. *Changes.*—The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. No change involving an estimated increase

or decrease of more than Five Hundred Dollars shall be ordered unless approved in writing by the head of the department or his duly authorized representative. Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered: * * *.

ARTICLE 4. *Changed conditions.*— Should the contractor encounter * * * during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications, the attention of the contracting officer shall be called immediately to such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall, with the written approval of the head of the department or his duly authorized representative, be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions.[11]

---

disputed that the conditions described here, which were encountered by plaintiff, were fully comparable to those encountered by Edwards. Thus, the board found (i) that plaintiff removed 607,754 cubic yards of borrow, 336,682 cubic yards of which were within haul distances shown on the plans, while 271,072 were beyond the haul distances shown on the plans; and (ii) that the subcontractor removed 175,833 cubic yards of borrow of which only 43,956 cubic yards were hauled according to the plans. It is in this context that plaintiff's claim is submitted not only on its own behalf but on behalf of Edwards.

10. The detailed calculations, as explained in the record, were as follows: For a 500-foot haul the tractor scraper spread would produce 2,592 cubic yards of borrow in a period of nine hours and earn a total revenue of $1,892.16 (2,592 times $0.73 per cubic yard). The cost of opera-

ating the spread for nine hours would be $1,741.42 so that the result of the nine-hour operation would be a profit of $150.74. By contrast, where the borrow haul was 3,600 feet instead of 500 feet, the same spread would produce but 926 cubic yards of borrow in a period of nine hours and earn a total revenue of $798.49 (which revenue would consist of $675.98 for 926 cubic yards of borrow at $0.73 per cubic yard, plus $122.51 for overhaul of the 926 cubic yards at the rate of $0.27 per cubic-yard mile). Since the cost of operating the spread for a 3,600-foot haul would be the same as for the 500-foot haul, i.e., $1,741.42, there would be a resulting *deficit* of $942.93 for the 3,600-foot haul ($1,741.42 minus $798.-49) as compared with a *profit* of $150.74 for the 500-foot haul.

11. Article 2 of the contract provided, in part, that "In case of difference between drawings and specifications, the specifi-

Incorporated by reference in the contract were Specifications FP–41—a 543-page booklet prepared by the Public Roads Administration of the Federal Works Agency and revised as of July 15, 1941, setting out specifications for construction of roads and bridges in national forests and parks. Since various provisions of FP–41 are at the heart of the present controversy, they are (though voluminous) reproduced below, in pertinent part, to assist in a full understanding of the issues:

Art. 1.18 *Extra Work* [Defined].— Work to be performed or labor and materials to be furnished by the contractor in order to complete the project in an acceptable manner, but for which there is no applicable basis of payment either direct or indirect, or contingent fund, provided in the bid schedule.

\* \* \* \* \* \*

Art. 2.2 *Interpretation of Quantities in Bid Schedule.*—The quantities appearing in the prepared bid schedule are approximate only and are prepared for the comparison of bids. Payment to the contractor will be made only for the actual quantities of work performed or materials furnished in accordance with the contract, and it is understood that the scheduled quantities of work to be done and materials to be furnished may each be increased or diminished as hereinafter provided.

Art. 2.3 *Examination of Plans, Specifications, and Site of Work.*—\* \* \* the bidder is required to examine carefully the site of the project contemplated, and the bid form, bid schedule, plans, specifications, and contract form prepared for the project contemplated. It is mutually agreed that submission of a bid shall be considered prima facie evidence that the bidder has made such examination and is satisfied as to the conditions to be encountered in performing the work as scheduled, or as at any time altered without resulting in increases or de-

creases or more than the percentage limits hereinafter stipulated, and as to the character, quality, and quantities of work to be performed and material to be furnished, including said contingent increases of more than the percentage quirements of the specifications, supplemental specifications, special provisions, and contract.

\* \* \* \* \* \*

Art. 4.2 *Subsurface and/or Latent Conditions at the Site.*—(a) It is mutually agreed that the words "subsurface and/or latent conditions at the site," as used in article 4 of Form 23 shall be construed to mean and to refer solely to conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications.

(b) It is further agreed that any modifications of the contract under articles 3 or 4 shall be made only as herein provided under articles 4.3(c), 9.3(b), and 9.4(c), and any claims must be asserted in writing.

Art. 4.3 *Changes and Increased or Decreased Quantities of Work.*—(a) It is mutually agreed that due to latent and/or unforeseen conditions, adjustments of plans to field conditions which cannot be foreseen at the time of advertising, will be necessary during construction, and it is therefore of the essence of the contract, to recognize such changes in plans as constituting a normal and expected margin of adjustment, not unusual and not differing materially in the meaning of article 4.2(a) and not involving nor permitting change or modification of contract prices, provided only that resulting overruns or underruns from the quantities in the bid schedule do not exceed reasonable percentages.

(b) It is further necessary and expedient that the contract fix within itself reasonable percentage limits (normal and

cations shall govern." Article 5 specified that "no charge for any extra work or material will be allowed unless the

same has been ordered in writing by the contracting officer and the price stated in such order."

expected) mentioned in 4.3(*a*), and the percentage limits so fixed are as follows:

1. If any or all items are changed resulting in a sum total change of 25 percent, or less, of the total cost of the contract calculated from the original bid quantities and the original contract unit prices, such change shall not be considered to involve or constitute an increase or decrease in the amount due the contractor, or any adjustment thereof, save the payment for the actual quantities at the original contract prices and save in the case described in article 4.3(*c*)2 below.

2. Within the above sum total change, any changes involving overruns or underruns in the case of one or more minor items, regardless of percent, shall not be considered to involve or constitute an increase or decrease in the amount due the contractor, or any adjustment thereof save the payment for the actual quantities at the original contract unit prices.

3. In no case shall a waiver of contract unit price apply to any item the quantity of which is changed less than 25 percent from the quantity appearing in the bid schedule.

(*c*)1. It is mutually agreed that, if demand is made by either party, overruns or underruns in any or all items resulting in a sum total change of more than 25 percent of the total cost of the contract calculated from the original bid quantities and the original contract unit prices, shall require a negotiated change order or supplemental agreement signed by both parties setting forth the necessity for the change and an adjustment of unit prices agreed upon as satisfactory to both parties.

2. It is mutually agreed that, if demand is made by either party, overruns or underruns of more than 25 percent of one or more major items shall require a negotiated change order or supplemental agreement signed by both parties setting forth the necessity for the change and an adjustment of unit price or prices agreed upon as satisfactory to both parties.

3. The contract does not obligate the contractor to perform at original contract unit prices, overruns or underruns generating a total in dollars or in miles of more than 25 percent of the original contract.

\* \* \* \* \* \*

Art. 6.1 [as revised] *Sources of Material. Furnishing Material. Royalties.*— (*a*) The Government does not assume any responsibility as to the quantity of acceptable material available at sources designated in the special provisions or otherwise designated. The contractor shall satisfy himself as to the quantity of acceptable material available at designated sources and as to the amount and nature of work required in producing material complying with specifications for the individual contract item, from the natural material available at such sources. It is to be understood that the engineer may order procurement of material from any portion of any area designated as a pit or quarry site, and may reject portions of the deposit as unacceptable. \* \* \*

Information on borrow areas is listed on the Borrow Location Sketch Sheet of the plans. \* \* \* If so directed by the engineer during construction, the contractor shall be required to use borrow deposits other than those shown in their general location on the plans. Material so obtained shall be paid for at the unit prices bid for the governing contract items. \* \* \*

\* \* \* \* \* \*

Art. 9.2 *Scope of Payments.*—The quantities listed in the bid schedule do not govern final payment. Payments to the contractor will be made only for the actual quantities of contract items performed in accordance with the plans and specifications and if, upon completion of the construction, these actual quantities show either an increase or decrease from the quantities given in the bid schedule, the contract unit prices will still prevail, except as provided in article 9.3 or 9.4.

The contractor shall accept the compensation, as herein provided, in full pay-

ment for furnishing all materials, labor, tools, equipment and incidentals necessary to the completed work and for performing all work contemplated and embraced under the contract; also for all loss or damage arising from the nature of the work, or from the action of the elements, or from any unforeseen difficulties which may be encountered during the prosecution of the work and until its final acceptance by the engineer, and for all risks of every description connected with the prosecution of the work; also for all expenses incurred in consequence of the suspension of the work as herein authorized.

\* \* \* \* \* \*

Art. 9.3 *Changes and Altered Quantities and Extra Work.*—(*a*) When the actual quantities of work ordered and performed vary from the corresponding quantities set out in the bid schedule but such variance is within the percentage limits hereinbefore agreed upon in article 4.3(*b*) as "normal and expected," and whether or not there have been any changes in plans the contractor shall accept, as payment in full so far as contract items are concerned, payment at the original contract unit prices for the actual quantities of work done and no allowance or other adjustment will be made for any increased expense, loss of expected reimbursement, or loss of anticipated profits, suffered or claimed by the contractor resulting either directly from such alterations, or indirectly from unbalanced allocation among the contract items of overhead expense on the part of the bidder and subsequent loss of expected reimbursement therefor or from any other cause, save the said payment for the actual quantity done at the original contract unit price.

(*b*) Whenever quantities vary from the original beyond the percentage limits recognized in article 4.3(*b*), if demand is made by either contracting party, adjusted prices and terms (not more than

15 percent in excess of estimated cost) shall be agreed upon and stated in covering change orders or supplemental agreements, signed by both parties.

Art. 9.4 *Work Orders, Extra Work Orders, Supplemental Agreements.*—

\* \* \* \* \* \*

(*b*) *Extra Work Orders.*—Extra work orders shall be issued for the following cases:

1. For the performance of any required extra work as defined in article 1.18 unless as more expedient the same is included by the engineer in a change order.

\* \* \* \* \* \*

(*c*) *Supplemental Agreement.*—Whenever the sum total cost of all items exceeds the original total contract cost by the percentage mentioned in article 4.3 (*c*)–1 if demand is made by either contracting party, an agreement shall be reached, establishing modified unit prices for all unconstructed major items whose quantities exceed the original quantities by 25 or more percent, and the contract correspondingly modified by a supplemental agreement which shall be a written agreement executed by the contracting officer or his duly authorized representative and the contractor. Where there are no major items changed more than 25 percent, adjustments shall apply to minor items changed more than 25 percent.

Agreed prices for any items in supplemental agreements shall not in any case be more than 15 percent in excess of cost as estimated by the engineer. \* \* \*

It is against this background that plaintiff submitted a claim in October 1954 which it later revised in April 1955 for additional compensation under the Changes or Changed Conditions clause for itself and its subcontractor attributable to the changes in the source of borrow material, and the resulting increase in overhaul.[12] The commission's district

---

12. Before formal submission of its claim, plaintiff had written to the commission in early August 1953 to inform it that the change in the borrow pit locations had resulted in much longer hauls than had been shown on the plans, which, in turn, had served to curtail seriously its borrow production, and that, in order to

engineer denied the revised claim in May 1955. "It is admitted," he stated, "that there were sources of borrow designated by the engineer other than those designated on the plans with consequent revision of haul distances and point of material deposit differing from those shown on the plans." He added: "Your claim that contractor's costs for borrow and overhaul were more than bid prices for those items of work is not challenged." He concluded, however, that in light of article 6.1 of FP–41 there was no evidence that sources of borrow were ordered differing from sources of borrow as authorized by the specifications, and that accordingly there were no changes as contemplated by article 3 of the contract. In July 1955 (after plaintiff had filed an appeal to the board) the contracting officer issued findings of fact and a decision denying the revised claim on the ground that there were no "changes in the drawings and/or specifications." The basis of the decision was that under article 6.1 of the specifications, the borrow pit locations were merely designed to aid prospective bidders, but did not relieve the contractor of his obligation to examine the site and satisfy himself as to conditions to be encountered, or exempt him from the requirement to use borrow deposits other than those shown in their general location on the plans.[13]

On appeal, the board (IBCA–50) held first that plaintiff was not entitled to an equitable adjustment under the Changed Conditions clause—notwithstanding the fact (as it indicated) that the locations and yields of the borrow pits indicated on the plans did not reflect the yields of the borrow pits used in construction—for the reasons (1) that articles 6.1 and 26–1.3 of the specifications [14] made clear that the government did not guarantee any of the data indicated on the plans and reserved the right to establish substitute borrow pits when pits indicated on the drawings failed; (2) that in the light of these provisions, together with article 2.3 of the specifications, plaintiff was not justified in regarding the borrow pit locations and other data on the drawings as positive representations made by the government; [15] and (3) that the first clause of the Changed Conditions article—authorizing an equitable adjustment if conditions encountered at the site differed materially from those shown on the drawings or indicated in the specifications— had been eliminated from the contract

---

coordinate its progress under these conditions, it would be necessary for it to reduce all operations other than unclassified excavation for borrow to one shift per day. Later that month, plaintiff wrote to the commission's resident engineer advising that it would submit a claim for additional compensation pursuant to articles 3 and 4 of the contract and article 4.3 of the specifications. It set forth in that letter a list of the borrow pit locations that had (it said) been changed up to that time, and emphasized that although the maximum length of haul from any pit originally specified on the drawings was 9,300 feet (1.76 miles), and that the average cubic-yard mile haul for borrow indicated on the drawings was .47 mile, it was actually being confronted with hauls of as much as 4.8 miles as a result of the borrow pit locations.

13. The contracting officer found that as of October 1954 when the initial claim was submitted, the overhaul already completed greatly exceeded the bid quantities.

Although plaintiff's revised claim sought an equitable adjustment for a change or changed condition, neither the district engineer nor the contracting officer considered the claim under the Changed Conditions clause.

14. Article 26–1.3 provided in part that the "sources of borrow materials shall be indicated on the plans and/or designated by the engineer * * *." See note 3, supra.

15. As to this, the board added: "To be sure, the contractor could hardly be charged with knowledge of the probable quantity or quality of material available at sources not designated until after the contract had been let, except, perhaps, insofar as general conditions in the neighborhood of the site could form a basis for such knowledge. But, since the Government was also privileged to open entirely new pits, the lesser risk was, so to speak, submerged in the greater. * * *"

in its entirety by article 4.2(a) of the specifications which provided that the words "subsurface and/or latent conditions at the site," as used in article 4 of the contract, should be construed to mean and to refer solely to conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications.[16]

With respect to plaintiff's claim under the Changes clause, the board construed articles 4.3(a) and 9.3(a) of the specifications as modifying the Changes clause of the contract (article 3) so as to preclude any equitable adjustment for changes resulting from unforeseen field conditions except for overruns or underruns in excess of 25 percent of estimated quantities. "The fact that such changes may also involve alterations or adjustments in the contractor's planned mode of operations, which turn out to be more expensive," the board said, "is no doubt unfortunate but legally immaterial under the terms of the specifications in the present case." Finding that the changes in the present case were due to unanticipated field conditions, the board concluded that plaintiff was thus entitled to additional compensation only by reason of overruns or underruns in excess of 25 percent of the estimated bid quantities. Since it found that the overrun in borrow was less than six percent, it held that plaintiff was thus not entitled to any equitable adjustment under the borrow item.[17]

The board similarly concluded that plaintiff would be entitled to a changes adjustment for overhaul only if there was an overrun in excess of 25 percent of the estimated bid quantity for this item. Stating that the record did not show the final amount of the overhaul in terms of cubic-yard miles,[18] the board remanded the question to the contracting officer to determine whether there was an excessive overrun in this item and, if so, the amount. Later, plaintiff was allowed a changes adjustment of $16,097 for overruns in excess of 25 percent of the estimated quantity of overhaul.[19]

Plaintiff moved for reconsideration contending (among other things) that the board, by giving effect to the modifications made by the specifications to articles 3 and 4 of the standard form construction contract, had disregarded or set aside public policy of the United States as contained in the regulations which provided that "except as otherwise

16. Plaintiff did not seek to prove before the board and does not contend here that it encountered conditions at the site falling within the second clause of the Changed Conditions provision, i.e., unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications.

17. The estimated quantity of borrow under the contract was 742,000 cubic yards and the board found that plaintiff and its subcontractor removed 783,637 yards for an overrun of less than six percent.

18. The record disclosed, however, as the board had previously noted, that plaintiff removed 607,754 cubic yards of borrow, 336,682 yards of which were within haul distances shown on the plans while 271,072 yards were beyond the haul distances shown on the plans. The record further disclosed, as the board also observed, that plaintiff's subcontractor removed 175,883 cubic yards of borrow, of which only 43,956 cubic yards were hauled according to the plans. See note 9, supra.

19. In accepting this amount, plaintiff informed the board that while not disagreeing with the mathematical computation, it did not accept the government's position and emphatically denied that the payment as tendered by the government was in any way proper or applicable to the claim as asserted and involved in its appeal. The board's conclusion, it should be added, that plaintiff was entitled even to this limited changes adjustment was based—necessarily—on the premise that the data contained in the drawings constituted positive representations (or contract requirements). But this premise, upon which the board thus impliedly had to proceed, is fundamentally inconsistent with the board's earlier conclusion that the data contained in the drawings did *not* constitute positive representations by the government in view of articles 6.1(a) and 2.3 and item 26.13 of the specifications.

authorized" standard form 23—the contract used in this case—"shall be used without deviation by all Executive agencies" except that "[a]dditional stipulations or instructions deemed necessary but not inconsistent with the provisions of the forms prescribed may be incorporated in the specifications, schedules, or other accompanying papers." 41 U.S.C. App. §§ 54.1(c) (1) and 54.3 (1952 ed.). The argument was rejected on the ground that plaintiff had no standing to raise the question as to whether the deviation was permissible, and the motion for reconsideration was denied.

■ The questions involved being ones of law—i. e., interpretation of contract provisions—they are for determination independently by the court unconstrained by the board decision. For the reasons that follow it is concluded (i) that plaintiff is entitled to an equitable adjustment (on its own and its subcontractor's behalf) as a result of changes in borrow pit locations ordered by the commission; and (ii) that such equitable adjustment, contrary to the board's decision, is not limited by the provisions of FP–41 to overruns in excess of 25 percent of estimated bid quantities, but rather applies to all the increased costs incurred by plaintiff and its subcontractor as a result of the changes.[20]

■■ There can be no doubt, at the outset, that the contract drawings constituted material representations for the guidance of the bidders as to the location of the borrow pits and the quantity of borrow material that was to be obtained from each. (Indeed, without such drawings it is difficult to see how any bid could have been made.) Moreover, plaintiff relied on the relative accuracy of the borrow pit locations and the other data set out in the drawings and was reasonably justified in doing so. For it had made its own site inspection before bidding and that inspection had revealed nothing from which it could reasonably be foreseen that the areas designated as borrow pits would fail to produce the quantities of borrow materials that were specified in the drawings to be available. It is true that article 6.1 of the specifications provided (i) that the "Government does not assume any responsibility as to the quantity of acceptable material available at sources designated in the special provisions or otherwise designated. * * *"; and (ii) that "If so directed by the engineer during construction, the contractor shall be required to use borrow deposits other than those shown in their general location on the plans." It is also true that article 2.3 of the specifications provided that the submission of a bid should be considered prima facie evidence that the bidder had examined the site and the contract documents and was "satisfied as to the conditions to be encountered in performing the work as scheduled, or as at any time altered without resulting in increases or decreases of more than the percentage limits hereinafter stipulated. * * *" But this court has frequently held in comparable circumstances that broad provisions of this kind—stating that the government does not guarantee the statements of fact contained in the specifications or drawings or requiring the bidder to investigate the site and satisfy himself of conditions, etc.—cannot be given their full literal reach and do not relieve the government from liability. United Contractors v. United States, 368 F.2d 585, 598, 177 Ct.Cl. 151, 165–166 (1966); Flippin Materials Co. v. United States, 312 F.2d 408, 413, 160 Ct.Cl. 357, 365 (1963), and cases cited at note 8; Fehlhaber Corp. v. United States, 151 F. Supp. 817, 825, 138 Ct.Cl. 571, 584 (1957), cert. denied, 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed.2d 108. See also e. g., Hirsch v. United States, 94 Ct.Cl. 602, 637 (1941); Ruff v. United States, 96 Ct.Cl. 148, 160, 162–164 (1942); Loftis v. United States, 76 F.Supp. 816, 825–826, 110 Ct.Cl. 551, 627–629 (1948); Peter Kiewit Sons' Co. v. United States, 74 F.Supp. 165, 167–168, 109 Ct.Cl. 517, 520–523 (1947); H. L. Yoh Co. v. United States, 288 F.2d 493,

---

**20.** Plaintiff's alternative claim under the Changed Conditions clause (article 4) need not be considered in light of the relief granted under the Changes clause.

153 Ct.Cl. 104 (1961). The short of the matter is that the information contained in the drawings constituted positive representations upon which plaintiff was justified in relying. It follows that the action taken by the commission in (i) designating substitute borrow pits to replace the pits originally designated in the drawings; (ii) ordering certain of the original borrow pits enlarged; and (iii) ordering plaintiff to perform borrow excavation and overhaul far in excess of the quantities shown on the contract drawings constituted compensable changes within the meaning of article 3 of the contract.[21]

 This brings us to the question of whether an equitable adjustment for such changes—which the board found were due to field conditions not foreseen by the parties—is precluded by the specifications (particularly article 4.3) unless there were an overrun or underrun in excess of 25 percent of estimated bid quantities. We begin with the established principles (i) that an interpretation which gives a reasonable meaning to all parts of a contract will be preferred to one which leaves a portion of it inoperative or superfluous; and (ii) that contract provisions should not be construed as conflicting unless no other reasonable interpretation is possible. Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 979, 169 Ct.Cl. 384, 395–396 (1965), and cases cited. These principles have particular force "when the provision sought to be eliminated, or subordinated, is a standard mandatory clause of broad application, like the [article 3 Changes provision]. * * * Such a standard article, incorporated in the agreement, cannot lightly

be read out of it, or deprived of most of its normal substance." Thompson Ramo Wooldridge Inc. v. United States, 361 F. 2d 222, 228, 175 Ct.Cl. 527, 536 (1966).

In this context, a reasonable interpretation of article 4.3 (as supplemented by articles 9.2, 9.3 and 9.4(c)—when considered in conjunction with the article 3 Changes clause of the contract—is (1) that the purpose of these specifications is to provide a ready means for avoiding controversy when, during the course of performance, the contractor is required, because of unforeseen field conditions, to do, within the prescribed percentage limits, a greater or lesser quantity of work than could be originally estimated; and (2) that a change in such circumstances is compensable under the Changes clause if the extra costs so incurred differ materially from the costs reimbursed through unit-price payments. This interpretation is fortified by the language of the specifications themselves. Article 4.3(a) is the key provision.

It emphasizes that "it is * * * of the essence of the contract to recognize * * * changes in plans as constituting a normal and expected margin of adjustment * * * not involving nor permitting change or modification of *contract prices*, provided only that resulting overruns or underruns from the quantities in the bid schedule do not exceed reasonable percentages." [Emphasis supplied.] The "contract prices" thus referred to are, obviously, the unit prices set out in the bid schedule, and hence the import of article 4.3(a) is clear that a modification *of such prices* will not be made except in cases of overruns or underruns exceeding prescribed limits. But this is not to say

---

21. Defendant asserts that the subcontractor could not have encountered a change, its argument being that at the time plaintiff let the subcontract it had ample knowledge that changes would be made in the borrow pit locations and that the subcontractor thus could not have been misled by the defendant. The argument has no merit. Defendant did not award a portion of the contract to plaintiff and a separate portion to the subcontractor; rather, it awarded a single, non-severable contract to plaintiff which computed its bid on the basis of representations made by defendant as to borrow pit locations. When defendant later changed the borrow pit locations, it was liable to plaintiff for an article 3 equitable adjustment for all such changes since the extra work (and expense) would necessarily have to be incurred whether it was performed by plaintiff itself or by plaintiff through its subcontractor. See note 9, supra.

that there cannot be a modification otherwise—separate and apart from a modification of the unit price—for the costs of extra work greatly differing from those compensable through unit-price payments. Indeed, articles 1.18 and 9.4(b) of the specifications expressly recognize that there may be payment for extra work for which no applicable basis for payment is provided in the bid schedule. Furthermore, article 4.3(a) contains no indication that it is to override the Changes clause or that the provisions of article 4.3(c), 9.3(b), or 9.4(c) of the specifications are to be the *exclusive means* for obtaining a changes adjustment.[22]

Particularly pertinent to the problem here is what this court said in United Contractors v. United States, supra, 368 F.2d at 601, 177 Ct.Cl. at 171, in considering a specification provision (Special Condition 32) [23] that is not unlike article 4.3 and the related provisions of the present specifications: "[T]here is no merit" (the court said) "to the contention that Special Condition 32 ('Estimated Quantities') fixes the unit price for excavation at $3.00 and prevents any added reim-

bursement. * * * The clause is a ready vehicle for adjusting, with a minimum of haggling, the compensation received by contractors who are called upon in the course of performance to do, within limits, more or less work than could be estimated. *But we have held that clauses of this type do not control when the cost of doing the extra work greatly differs from the stated unit-price because of factors not foreseen by either party.* In that event, the Changed Conditions clause comes into play and overrides the Special Condition.[24] Peter Kiewit Sons' Co. v. United States, 74 F.Supp. 165, 168, 109 Ct.Cl. 517, 522–523 (1947); Loftis v. United States, 76 F.Supp. 816, 825–826, 110 Ct.Cl. 551, 627–629 (1948); cf. H. L. Yoh Co. v. United States, 288 F.2d 493, 495, 153 Ct.Cl. 104, 107–108 (1961)." [Emphasis supplied.]

On the other hand, to adopt the board's contrary interpretation—that the contract and specifications preclude an equitable adjustment unless there were an overrun or underrun in excess of 25 percent of estimated bid quantities—[25] would leave a contractor without admin-

22. In this latter respect, article 4.3(a) is to be contrasted with article 4.2(b) of the specifications which appears under the caption "Subsurface and/or Latent Conditions at The Site" and provides that "any modifications of the contract under article 3 or 4 shall be made *only* as herein provided under articles 4.3(c), 9.3(b) and 9.4(c). * * *" [Emphasis supplied.] It is significant that article 4.3 (a) of the specifications contains no such comparable language. It is to be added that article 4.2(b), when considered in context with other specification provisions, was manifestly designed not to eliminate the Changes clause from the contract, but rather to make that clause inapplicable to a modification for a "subsurface and/or latent condition" as that term is defined. Thus, as the contracting officer and the board recognized, an equitable adjustment for total deletion of the selected borrow surface course was not limited by articles 4.3(c), 9.3(b) and 9.4(c), but rather could be made under the Changes clause.

23. Special Condition 32 required completion of the work at the specified unit price even when performance involved

"quantities greater or less than the estimated quantities," unless the "actual quantity of work performed under any item" varied from "the estimated quantity by more than 25%." When there was an overrun, the provision sanctioned renegotiation of the unit price only for "the actual quantity of work * * * in excess of the estimated quantity plus 25% thereof."

24. There is no significance in the fact that the clause involved here is the Changes rather than the Changed Condition clause.

25. In reaching this conclusion, the board noted that plaintiff in its claim submitted in October 1954, as well as in an earlier letter in the latter part of August 1953 advising it would submit a claim (see note 12, supra), had sought recovery under article 4.3 of the specifications; the board concluded that it was thus justified in accepting a construction put upon the requirements of the contract by the contractor itself. It is far from clear, however, that in the claims letters referred to plaintiff did, in fact, construe the contract as making the provisions of the specifications the governing measure

the intendment of the contract considered as a whole. For such an interpretation would leave a contractor without administrative recourse against any change in the contract drawings or specifications due to unforeseen field conditions which did not result in the prescribed overrun or underrun in quantities, even though the entire contemplated basis for performance of the contract may have been altered at a substantially increased expense to the contractor. For example, if a contract provided that 20,000 cubic yards of cement were to be placed in a location near a source of supply and the location, due to unforeseen field conditions, was changed to a location a mile greater in distance from the source of supply, the contractor, under this interpretation, would be precluded from obtaining *any* equitable adjustment for the increased costs so incurred unless the quantity of cement required to be placed were also changed by an excess of 25 percent of the initially estimated amount.[26] Nothing in the contract reasonably read in light of established principles of construction requires such a result.

> in determining its right to additional compensation. (Indeed, it is doubtful that plaintiff ever acquiesced in that position.) But even assuming the import of these claims letters to be, as the board stated, expressions of opinion by a contractor layman in filing a claim as to rights it thought it had, would have little probative value, particularly in the circumstances of this case. See Kaiser Industries Corp. v. United States, 340 F.2d 322, 336, 169 Ct.Cl. 310, 335 (1965). For plaintiff filed a revised claim (in April 1955) in which it specifically insisted that the formula contained in the specifications would not provide adequate compensation for the increased costs brought on by the changes.

> **26.** The board took note in its opinion of this illustration (and one other) and replied that "the answers would depend, obviously, on the motive of the contracting officer in making the change, and on whether the work ordered was extra, or fell under the pay items of the contract."

> **27.** Since article 3 provides complete administrative relief for the present claim, it is converted from a breach of contract

It is concluded, in short, that the equitable adjustment for the changes required by the government is not limited by the specifications to overruns or underruns in excess of 25 percent of estimated bid quantities. Instead, plaintiff is entitled to an equitable adjustment under the Changes clause (on its own behalf and on behalf of its subcontractor) for all the increased costs resulting from the changes in question—which amount (to prevent double recovery) is to be reduced by $16,097 for the compensation plaintiff has already received for the overrun in overhaul. See United Contractors v. United States, supra, 368 F. 2d at 600, 177 Ct.Cl. at 169–170. The amount of recovery will be determined in the first instance (if the parties do not agree) by the Board of Contract Appeals of the Department of the Interior. See e. g., United States v. Anthony Grace & Sons, 384 U.S. 424, 86 S.Ct. 1539, 16 L. Ed.2d 662 (1966).[27]

## II. *Claim Related (In Part) to Deletion of Selected Borrow Surface Course*

We come now to plaintiff's second claim—consisting of two items—in which

> claim to a claim for relief under the contract. United States v. Utah Construction & Min. Co., 384 U.S. 394, 404, n. 6, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); Morrison-Knudsen Co. v. United States, supra, 345 F.2d at 837, 170 Ct.Cl. at 763–764. But were such administrative relief not available, plaintiff would be entitled to recover damages for breach of contract (cf. Northbridge Electronics, Inc. v. United States, 175 Ct.Cl. 426, 429, n. 1, 440 (1966) ); on the basis of incorrect representations by defendant. For the evidence before the board established that the representations were material; that plaintiff justifiably relied on them; and that plaintiff was misled since it neither knew nor had reason to know that they were erroneous. E.g., Dale Construction Co. v. United States, 168 Ct.Cl. 692, 703–704 (1964); Flippin Materials Co. v. United States, supra, 312 F.2d at 413, 160 Ct.Cl. at 365. The fact that the representations were not made in bad faith or with any intent to deceive is immaterial. Christie v. United States, 237 U.S. 234, 242, 35 S.Ct. 565, 59 L.Ed. 933 (1915); United States v. Atlantic Dredging Co., 253 U.S. 1, 12, 40 S.Ct. 423, 64 L.Ed. 735 (1920).

review is sought of the board's decision (IBCA–36) denying *in toto* its request for an equitable adjustment under the Changes clause.

A. *Item 1.* In this aspect of the claim, plaintiff contends (as previously set out) that the commission, both before and after the elimination of the selected borrow surface course, compelled it to use borrow material containing rocks over six inches in diameter that were unsuitable for use in the top 12 inches of the subgrade. It says that the board's decision denying it a changes adjustment was arbitrary and legally erroneous.

Our starting point is article 29–3.2(b) of the specifications which provided that "Suitable material shall be conserved for constructing the top portions of embankments and no rocks or hard lumps that cannot readily be broken up into pieces not over six inches in diameter shall be placed in the upper .12-inch layer." Against the background of this article, the board held (on reconsideration by a 2 to 1 vote) [28] (i) that the specifications did not place upon the commission the obligation to designate materials for the 12 top inches of the subgrade that met specification size requirements; (ii) that the primary requirement under article 29–3.2(b) was that suitable materials, rather than material of any specified maximum size, should be utilized for topping the subgrade; (iii) that the specifications imposed a specific duty upon the plaintiff to conserve suitable material for topping; and (iv) that article 41–3.1 of the specifications made

manifest that oversized rocks and boulders in the borrow were to be anticipated [29] so that plaintiff, in the board's words, "could not validly object to the presence of oversized rock in borrow material so long as sufficient quantities of material suitable for the construction of the upper layer of the embankment were available, nor could it object to having to separate, by blading or otherwise, the suitable from the unsuitable material even though this might involve the windrowing of the oversize material [30] and might increase the labor costs of placement to some extent. * * *"

Indicating that the best guide to the meaning of the contract was the construction the parties themselves had given to it, the board found that plaintiff had not made any demand during the course of construction that it be furnished with six-inch minus material. In addition, it asserted that the government had always denied that it had failed to designate material meeting the specifications for the top 12 inches of the subgrade—in which connection it emphasized that the testimony of plaintiff's witnesses established that the commission did, in fact, designate *some* pits which contained material smaller than six inches in diameter. The board found also that a reasonable amount of overhaul to obtain finishing material had been allowed by the commission and that plaintiff thus had not established that it suffered from lack of proper topping material. The board added that the record was particularly unsatisfactory with respect to the precise quantities and the quality of ex-

---

**28.** In its first opinion, the board (then consisting of two members) rejected this aspect of the claim without discussing many of the pertinent issues involved.

**29.** This article, as amended by the special provisions of the contract, was part of the contract's "General Requirements" and provided in part: "All boulders or ledge appearing in the excavation shall be removed or broken off to a depth of not less than 9 inches below the subgrade. * * * Oversize rocks and boulders resulting from the placing and finishing of roadway borrow or other grading operations shall be aligned along the toe of the

slope where the roadway is on fill and in such manner that drainage will not be obstructed. Where the roadway is in cut, all oversized material from any source whatever shall be removed from the ditches, and disposed of as directed by the engineer."

**30.** Windrowing consisted of removing the oversized rock from the road with graders and placing it in a one- to two-foot high mound in a row at the edge of and paralleling the road. The rock was then loaded in a truck, hauled away and dumped, or was pushed by a scraper over the shoulder of the road.

cavation and borrow material that could be regarded as suitable for topping material; that plaintiff's subcontractor Edwards, although it had the worst material, did not file a claim with the plaintiff or the commission, and plaintiff was filing this part of the claim on its own motion and without written authorization; and that plaintiff had not shown it had made a diligent effort to conserve topping material. The board concluded, in summary, that "even assuming an interpretation of the requirements of the specifications most favorable to plaintiff, it has failed to prove that, although it made every effort to conserve suitable material for topping from both excavation and borrow, the Government failed to designate sources of borrow from which deficiencies of suitable borrow material could be made up." "The actual basis of the * * * [plaintiff's] complaints," the board continued, "both prior to and subsequent to the deletion of the select borrow surface course, was that the borrow material contained too much over-sized material that had to be windrowed but the obligation to do this was consistent with the requirements of the specifications." "The * * * [plaintiff's] specific demands for 6-inch minus material" (the board stated) "were not made until after the work had been completed, and was then * * * a mere afterthought, conceived in its grand strategy to formulate an allowable claim." Finally, the board held that the claim, in any event, was barred by plaintiff's failure to file written notice of the claim within 10 days from the date the change was ordered, as required by article 3 of the contract and article 5.1 of the specifications.[31]

For the reasons discussed below, it is concluded (i) that the board's interpretation of the specification provisions was erroneous; (ii) that its findings of fact

disregarded the uncontradicted evidence in the record and were thus arbitrary; (iii) that the uncontradicted evidence before the board established that the commission required plaintiff to use borrow material for the upper 12 inches of the subgrade that contained—contrary to the specification provisions—substantial amounts of oversized rocks and boulders; (iv) that as a result of these requirements, plaintiff and its subcontractor Edwards were compelled to windrow the oversized rocks from the borrow material in order to produce a topping layer for the subgrade that complied with the specifications; (v) that the necessity of thus windrowing the oversized rocks and thereby producing a suitable topping material constituted a material change in the requirements of the contract; and (vi) that plaintiff is entitled to recover on its own behalf and on behalf of its subcontractor Edwards an equitable adjustment for the increased costs that resulted from such change.

First the board erred as a matter of law in failing to recognize that the provisions of articles 6.1 (as revised), 24–3.4, 26–2.1, and 29–2.1 of the specifications placed an affirmative obligation on the commission to select and approve the borrow and excavation material that was suitable for use in the embankments, including the 12-inch thick layer of topping material that had to be placed thereon. The provisions of articles 29–2.1 (and 29–1.1) spelled out this requirement by providing that material for embankments "*shall consist of suitable material approved by the [commission] engineer.*" [Emphasis supplied.] Insofar as borrow was concerned, articles 26–1.1 and 26–2.1 specified that it must consist of approved material excavated from borrow pits "*selected by the engineer as meeting the specifications* for the particular embankment or backfill for which the ma-

---

31. A board member dissented stating that plaintiff's failure to comply with the notice provisions had been waived by the contracting officer; and that on the merits plaintiff had borne the burden of proving that for at least some stretches of the road the contracting officer had failed to designate borrow pits or other sources of embankment material that contained specification size materials in sufficient quantities, when reasonably conserved by plaintiff, to build the top 12 inches of the subgrades in such stretches.

terial is intended." [Emphasis supplied.] Similarly, article 24–3.1 relating to roadway and drainage excavation provided that all suitable material removed from the excavations was to be used by plaintiff as far as practicable "in the formation of the embankments * * * and at such other places *as directed.*" [Emphasis supplied.] Article 24–3.4 contained the further proviso that roadway excavation deemed suitable for the topping layer of the subgrade "shall be saved and utilized for those purposes *as directed by the engineer.*" [Emphasis supplied.] Finally, the provisions of article 6.1(a) (as revised) and of article 6.1(c) conferred authority upon the commission's engineer to reject portions of pits "as unacceptable" and to determine when the plaintiff had obtained "all the acceptable material from all the sources designated in the special provisions. * * * "

These provisions, it is clear, relieved the plaintiff of any and all responsibility for the selection of suitable excavation and borrow material to be placed in the embankment, including the 12-inch topping layer thereof. Hence the board was in error in absolving the commission of responsibility to select and approve the materials employed by plaintiff in constructing the roadway, and particularly the topping layer of the subgrade. Rather, when all the above-referenced provisions of the specifications are considered *in pari materia* with the provisions of article 29–3.2(b), it is apparent that the commission had the duty and responsibility of selecting borrow and excavation materials for use as embankment, and especially as topping material, that met the specified requirements for such use, i. e., were "suitable" within the meaning of the specifications. The requirements for material suitable to be employed in the upper 12-inch layer of the subgrade were set forth in article 29–3.2(b). This article, in specifying that the material must be "suitable" for use as topping material, established a criterion of suitability that the material contain "no rocks or hard lumps that cannot readily be broken up into pieces not over 6 inches in diameter" and, as a corollary, prohibited the placement in the topping layer of any oversized material that could not readily be broken up to the maximum six-inch size.

The further conclusion by the board that the provisions of articles 24–3.1, 24–3.4 and 29–3.2(b) of the specifications imposed a "specific duty" upon plaintiff *to conserve suitable material for use as* topping material is in direct conflict with the terms of these provisions. For article 24–3.1 specifically provided that "All suitable material removed from the excavations shall be used as far as practicable in the formation of the embankment * * * and at such other places *as directed.*" [Emphasis supplied.] Article 24–3.4, which appeared under the caption *"Conserving Cushion and Finishing Material,"* specified that excavated material taken from the cuts and deemed suitable for topping "shall be saved and utilized for those purposes *as directed by the engineer.*" [Emphasis supplied.] While the similar language of article 29–3.2(b) did not expressly specify that the conservation of borrow should be accomplished as directed by the engineer, such a requirement was clearly implied from the fact that the material conserved had to be "suitable material," and (as set forth previously) the determination of suitability was clearly within the province of the engineer.[32] In view of these provisions, plaintiff had no obligation to undertake to save excavation and borrow material for use in the topping layer until such time as the commission engineer first determined it was suitable

32. The board also cited articles 24–5.1(c), 25–5.1(c) and 26–5.1(c) as further support for its holding that the specifications imposed a specific duty on the contractor to conserve suitable material for topping. These articles, however, merely provided that unit prices for unclassified roadway excavation, unclassified excavation for structures and borrow excavation included the cost of any conserving of topping material, and contained nothing that made it plaintiff's responsibility to determine what material was to be conserved.

for this purpose and then directed its conservation. It is significant in this connection that there is no evidence in the record of any occasion on which plaintiff had been directed by the engineer to conserve material for this purpose.

■ We turn next to the board's conclusion that the provisions of article 41–3.1 of the specifications (quoted in note 29, supra) were sufficient to put plaintiff on notice (1) of the presence of oversized rocks and boulders in the borrow material; and (2) of the possibility that it might have to windrow such oversize material in order to obtain topping material. This conclusion ignored the fact that in constructing the embankment, plaintiff was permitted by the provisions of articles 29–1.1 and 29–3.3(c) to use straight run excavation and borrow material as long as any boulders and pieces of rock exceeding 24 inches in diameter were removed. Hence, article 41–3.1 was intended to apply chiefly to the oversized rocks and boulders required to be eliminated during construction of portions of the embankment other than the 12-inch topping layer. In addition, the provision was applicable to any isolated rocks and boulders over six inches in diameter which, in a job of this magnitude, obviously would be encountered in the material selected for placement in the topping layer. To conclude, however, as the board did, that these *general* provisions which, under the terms of article 41–1.1 related to the construction of the embankment as a whole, were paramount to the *specific* provisions of article 29–3.2(b) relating to the construction of the topping layer is contrary to the established canon of construction that in case of inconsistency between general provisions and specific provisions

of a contract, the specific provisions will govern. E. g., Williston on Contracts (Rev. ed.) § 619, p. 1784; Restatement, Contracts § 236.

■ Erroneous, too, was the board's determination (on reconsideration) that the claim was barred because of plaintiff's failure to give written notice of the elements of the claim within the 10-day period prescribed by the contract.[33] For the action of the contracting officer, in his decision of May 4, 1955, in considering the claim constituted a waiver of any question concerning the lack of timeliness, his action being fully within the scope of the authority conferred upon him by article 3 of the contract which authorized him to receive and consider any claim by the contractor for an equitable adjustment attributable to changes in work "at any time prior to the date of final settlement of the contract." George A. Fuller Co. v. United States, 104 Ct.Cl. 176, 218 (1945); Consolidated Eng. Co., etc. v. United States, 98 Ct.Cl. 256, 286 (1943); Arundel Corp. v. United States, 96 Ct.Cl. 77, 110 (1942); W. E. Callahan Constr. Co. v. United States, 91 Ct.Cl. 538, 610–611 (1940); Thompson v. United States, 91 Ct.Cl. 166, 179 (1940). See also Moran Bros., Inc. v. United States, 346 F.2d 590, 593, 171 Ct.Cl. 245, 250 (1965).

We consider now the undisputed evidence before the board which, in summary, was as follows: Beginning in the early stages of construction and continuing after elimination of the selected borrow surface course, the commission engineer directed plaintiff to use borrow material from nearby designated pits in constructing the top 12 inches of the subgrade, notwithstanding that the material available from a number of such pits contained a considerable amount of over-

---

33. In its original opinion the board concluded that the 10-day notice requirement had been waived by virtue of the fact that the contracting officer had considered the claim on its merits; on reconsideration, the majority of the board declared that its previous statement of waiver was in error and was withdrawn. It may be noted in passing that at the

board hearing government counsel conceded that any question of lack of timeliness had been waived—a matter which was specifically noted for the record by the presiding board member who, in turn, later wrote the initial board opinion and the succeeding majority opinion on reconsideration.

sized rocks and boulders.[34] In some instances a substantial quantity of material suitable for the topping layer was available from more remote pits, and plaintiff was advised by the commission engineer that while it could use such material, it would not be paid overhaul for obtaining it since the commission lacked the necessary funds. The net result was was that on frequent occasions plaintiff was required (in effect) to use material in constructing the topping layer that contained a substantial amount of rocks and boulders. This necessarily made its task of bringing the subgrade to the finished elevations much more difficult since the coarse material had to be processed repeatedly with graders to work the oversized cobblestones to the edge of the roadway where they could be machine worked beyond the construction limits or loaded into trucks and hauled away.

Because of the additional work it thus had to perform, plaintiff filed a protest and claim on July 12, 1953, for extra compensation on the asserted ground that no portion of a specified borrow pit was suitable for topping material and that it was thus necessary to construct the entire embankment with the available material containing boulders up to two feet in diameter. The claim was rejected by the commission on the ground that the decision regarding the suitability of the material rested entirely with the commission engineer. In October 1953, plaintiff again wrote the commission to protest the continued incorporation of material not suitable for construction of embankments in the roadway and stated that the material obtained from four additionally specified borrow pits was of very poor quality and that it could not accept responsibility for the roadway constructed with this kind of material. The commission responded by again asserting that the responsibility for determining the acceptability of the material rested entirely with its engineer.

On April 28, 1954, the commission issued a change order eliminating the selected borrow surface course from the contract. Following this action plaintiff wrote the contracting officer on June 18, 1954, requesting a conference. In the communication it asserted (among other things) that both before and after the deletion of that item it had been directed to go into borrow pits and use oversized materials for surfacing the subgrade that were unsuitable; that in various cases its forces had to remove fully half the volume of newly placed material in trying to work it into a finished surface; and that, in addition, the cobbles as worked out had to be windrowed to the shoulders, and in many cases to the ditch lines, thereby causing additional trouble and expense. The conference so requested was held on July 15, 1954, at which time plaintiff's representatives reiterated their complaint. To obviate the problem, plaintiff's representatives again called attention to the fact that borrow material

34. This conclusion—that plaintiff was directed by the commission to use such oversized materials for the topping layer —is made clear not only by the testimony of plaintiff's witnesses but also by the May 4, 1955, decision of the contracting officer which (as the dissenting board member pointed out) conceded that some of the designated borrow pits contained course material that was difficult to handle in the preparation of the subgrade. Likewise, the government engineer who supervised the contract readily agreed on cross-examination at the board hearing that plaintiff was not "furnished with six-inch minus material for the upper 12-inch layer." The board opinion on reconsideration regarded this, however, as an answer to a "trick" question on the basis (the board said) that the government had no obligation to "furnish" material but only to designate borrow pits from which the contractor would obtain the material. There can be no doubt, however, from an examination of the entire transcript that the term "furnished" was well understood by all parties to be a convenient shorthand way of referring to the commission's obligation to designate materials for the topping layer of the subgrade. Moreover, this same government witness testified on direct examination, in response to a question by government counsel, that during construction of the road large rocks and boulders were found intermixed with the borrow material.

meeting the contract specifications for the topping layer of the subgrade was available in a few widely spaced pits, and requested permission to overhaul such material throughout the project to help overcome the difficulty of producing a uniform, smooth-finished surface with the oversized subgrade material. During the conference the contracting officer advised plaintiff that he had, ten days before, instructed the commission engineer to authorize overhaul for purpose of obtaining finer materials for the subgrade. Thereafter, the contracting officer wrote plaintiff on July 21 stating that the "Commission will * * * authorize the contractor to obtain and place finer borrow material to cover several short sections where cobblestones will not permit finishing work without considerable extra effort." He further stated that "This latter course is to be optional with the contractor to fit his program and equipment"; and that payment would be at bid prices. This was followed two days later by a telegram from the commission to its engineer authorizing up to $15,000 to be expended for the overhaul of topping material to assist in overcoming the effect of the presence of cobblestones in the embankment. However, in the weeks that followed, plaintiff did not receive the promised overhaul authorization from the commission to permit the obtaining of finer material for the topping layer. Hence on August 19, 1954, a representative of plaintiff visited a commission representative to make a renewed request that plaintiff be permitted to overhaul suitable material at the commission's expense. On August 24, 1954, the commission representative wrote to plaintiff to advise that his investigation had revealed "that additional overhaul had been allowed in the amount of approximately $5,000." This statement, however, was incorrect because, while overhaul of borrow in the amount of $5,000 had been authorized, the material for which the overhaul was permitted was not borrow

suited for use as topping material and had not been employed to assist the plaintiff in obtaining a suitable finished surface on the subgrade. Instead, one portion of the borrow material comprising such authorized overhaul, consisting of 11,308 cubic yards of material, was hauled to and placed on a section of the road which had been originally constructed with sandy materials, and which was found to require additional rock and heavy material to give it stability. In the second instance, overhaul was allowed to enable plaintiff to bring in coarse material (not suited for the topping layer) to overcome a shortage of borrow material which developed when the pit at milepost 60.5 had to be abandoned due to an excessive flow of subsurface water into the pit. The remainder of the overhaul mentioned in the commission's letter of August 24th had been authorized to provide material to stabilize a blue clay and gray silt material that had been used in the embankment over plaintiff's protest, and which subsequently proved to be unstable. Although plaintiff verbally informed the commission representative of the incorrect statements contained in the letter of August 24th, and again requested that the overhaul of topping material be authorized as approved by the contracting office, the authority to overhaul such material continued to be withheld throughout the life of the job.

█ Against this background, the board's conclusion that plaintiff did not make a specific demand for suitable topping material during the performance period and that this element of plaintiff's claim was merely an afterthought is contrary to the uncontradicted and undisputed evidence in the record. The unrebutted testimony of plaintiff's superintendent established that plaintiff requested that the commission make available topping material complying with specifications, and that these requests were refused on the basis that the commission did not have the money to comply with such requests.[35] In addition, the docu-

---

35. The testimony of plaintiff's project engineer, upon which defendant relies,

that he himself did not request that suitable topping material be made available

mentary evidence also makes clear that plaintiff requested that it be furnished suitable material for the topping layer, or, in the alternative, that the commission pay it for the increased costs of finishing the surface of the embankments with the unsuitable materials being made available to it. The record makes it apparent, in short, that plaintiff, throughout the performance period, gave the commission adequate notice that it was being furnished topping material that did not meet the specification requirements, and that it was desirous of obtaining suitable topping material to facilitate the completion of the finished grade.

Likewise contrary to the undisputed evidence was the board's conclusion that plaintiff was, in fact, allowed a reasonable amount of overhaul to obtain suitable topping material. As set out above, the commission's representative elected to expend only $5,000 of the $15,000 authorization for overhaul, and this sum was expended in its entirety to relieve conditions other than the problems involved in the finish grading operations.

Nor is the claim barred by the fact that the record was, as the board stated, "particularly unsatisfactory with respect to the precise quantities and the quality of excavation and borrow material that could be regarded as suitable for borrow material." The issue before the board was—in the first instance—one of liability rather than quantum, and hence it was sufficient, in order for plaintiff to meet its burden of proof, to show—as it did—that for some portion of the work the commission compelled it to use borrow material for the top 12 inches of the subgrade that contained a substantial amount of oversized rocks and boulders. Upon a finding by the board in favor of plaintiff on the ques-

tion of liability, the question of quantum (which would depend in part upon how much of the borrow material designated by the commission was unsuitable for the topping layer) would be determined by the contracting officer on remand. See Gholson, Byars and Holmes Constr. Co. v. United States, 351 F.2d 987, 994, 173 Ct.Cl. 374, 387 (1965). There is no basis, moreover, for defendant's argument that plaintiff's relief should, in any event, be restricted to the five borrow areas it referred to in its claims letters in July and October 1953. It is not necessary for a contractor to repeatedly give notice of the same physical factors which were made the basis of an initial notice if such conditions continue to recur. Allied Contractors, Inc. v. United States, 277 F.2d 464, 466, 149 Ct.Cl. 671, 675 (1960). Further, it is immaterial that plaintiff filed no written authorization to present a claim on behalf of its subcontractor Edwards and that the subcontractor filed no claim with plaintiff or the government. In the first place, although the written contract between plaintiff and Edwards was not placed in evidence, plaintiff's witness testified that plaintiff was obligated by its terms to advance this claim on behalf of Edwards and that any recovery allowed to Edwards would be paid over to it. In light of this testimony neither the commission nor the board requested plaintiff to produce the subcontract; hence, plaintiff's testimony stands unrefuted and the board's conclusion that plaintiff had no authority to proceed on behalf of the subcontractor is mere speculation unsupported by any evidence in the record. Second (and more important), there is no privity between the government and a subcontractor so that the government lacks standing to complain that written authorization was not filed or that the subcontractor

---

does not afford any basis for the board's conclusion. Plaintiff's project engineer testified that it was not his function to carry on negotiations with the commission, and the board entirely disregarded the uncontradicted testimony of plain-

tiff's superintendent, whose responsibility it was to take such action, that on several occasions he had requested suitable material for the topping layer, and that such requests were refused.

failed to file a claim with the plaintiff or the government. In such circumstances, the government can, at most, complain that recovery by plaintiff on behalf of the subcontractor is barred by the *Severin* doctrine—which prevents a contractor from recovering damages for losses sustained by a subcontractor where the subcontract negates liability of the prime contractor to the subcontractor (Severin v. United States, 99 Ct.Cl. 435 (1943), cert. denied, 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944)). Even if it be assumed (without deciding) that the *Severin* doctrine is applicable to a claim for equitable adjustment as distinguished from a claim for breach of contract,[36] recovery by the prime contractor for his subcontractor's costs is not contingent upon his placing the subcontract in evidence or bearing the burden of establishing his liability to the subcontractor. See e. g., United States v. Blair, 321 U.S. 730, 737, 64 S.Ct. 820, 88 L.Ed. 1039 (1944); Donovan Construction Co. v. United States, 149 F. Supp. 898, 900, 138 Ct.Cl. 97, 99 (1957), cert. denied, 355 U.S. 826, 78 S.Ct. 34, 2 L.Ed.2d 39; Southern Construction Co. v. United States, 364 F.2d 439, 447, 176 Ct.Cl. 1339, 1351–1352 (1966); Garod Radio Corp. v. United States, 307 F.2d 945, 947, 158 Ct.Cl. 596, 601 (1962). "To come under the *'Severin'* doctrine the *defendant* must show, through some contractual term or a release, that the plaintiff-prime is not liable to the subcontractor." Blount Bros. Constr. Co. v. United States, 346 F.2d 962, 965, 171 Ct.Cl. 478, 483 (1965). [Emphasis supplied.] See also Blount Bros. Constr. Co. v. United States, 348 F.2d 471, 473, 172 Ct.Cl.

1, 6 (1965). And this defendant has not shown.

▆▆ Plaintiff is entitled to an equitable adjustment under the Changes clause (on its own behalf and on behalf of its subcontractor Edwards) for the additional costs resulting from the directions of the commission which required use of oversized materials in constructing the top 12 inches of the subgrade. In the absence of agreement by the parties, the amount of recovery will be determined in the first instance by the Board of Contract Appeals of the Department of the Interior.

B. *Item 2.* In this aspect of the claim, plaintiff contends that after the commission eliminated the selected borrow surface course from the contract in April 1954, it required plaintiff to complete the subgrade to lines and grades without reasonable tolerances and in such a manner that the subgrade would accommodate traffic moving at the rate of 50 miles an hour. As to this item, the board found that the roadway which was constructed was substantially identical to the roadway provided for by the specifications and drawings; that under the specifications a reasonable variation of tolerances was allowable; and that flexible tolerances were required by the commission which were not unreasonable.

▆▆ These findings of the board are amply supported by the record and are thus final. For there was substantial evidence before the board which showed (i) that after the deletion of the surface course, the commission required no greater tolerances for finishing the subgrade

---

36. In recent years the Armed Services Board of Contract Appeals, reversing Charles H. Tompkins Co., ASBCA 2661 (1955) has consistently held that the *Severin* doctrine is not applicable to claims for equitable adjustment under contract clauses providing for price adjustment, the board's rationale being that such clauses are based not on whether the contractor was damaged but on whether he is entitled to a price adjustment which was agreed to be made when the risk assumed by the government materialized. See e. g., Roscoe Eng. Corp., ASBCA 9070, 65–2 BCA ¶4992 (1965); Morrison-Knudsen, ASBCA 4929, 60–2 BCA ¶2799 (1960); D & L Construction Co., ASBCA 6163, 1963 BCA ¶3676. Accord: Unicon Management Corp., VACAB 470, 65–2 BCA ¶5138 (1965); Holt-Drake, VACAB 422 (1961). Contra: Foster Construction Co., DCAB No. PR–36, 65–1 BCA ¶4787 (1964).

than would have been required had the surface course not been eliminated; (ii) that plaintiff was not held to unusually strict tolerances either before or after the elimination of the surface course; and (iii) that the tolerances required at all stages of construction were only those required for a subgrade. Indeed, plaintiff's engineer testified that even before the surface course was eliminated, plaintiff assumed that the subgrade would be constructed to the blue tops; and that plaintiff generally got within a tenth of a foot of this grade.[37] There is substantial evidence showing, moreover, that after elimination of the surface course, tolerances of at least a tenth of a foot of the blue-top grade were allowed, with deviations of up to four-tenths of a foot allowed when soil conditions permitted.

Plaintiff also maintains that after deletion of the surface course, it was still obliged to construct a road to accommodate traffic at 50 miles per hour. But it is difficult to see how such an obligation (assuming, contrary to the record, that it was specifically imposed) would have increased plaintiff's work under the contract. For the record shows that in order to comply with the applicable subgrade specifications (i. e., item 41), the contractor is required to construct a subgrade that can be, and often is, used as a roadway to accommodate traffic at 50 miles per hour. This was recognized by plaintiff itself as is made apparent by the testimony of its own project engineer. Thus, he testified that plaintiff had virtually completed the first 20 miles of the subgrade in 1953; that it was open to all traffic; and that "in fact, there was a great deal of hauling over that particular section of the road, over the whole project as far as that goes, at almost any speed that one wished to drive."

It is concluded that plaintiff is not entitled to recover on this aspect of its claim.

### III. *Claim for Increased Costs Resulting from Shutdown for the Winter of 1954–1955*

This claim is for delay-damages for asserted breach of contract and, by agreement of the parties, is to be determined on the record of proceedings before the board. See note 6, supra.[38] Plaintiff's contention, for one thing, is that as a result of the disorganization of its operations and the difficulties caused by the relocation of the borrow pits (Claim 1), plus the additional work the commission required plaintiff to perform in the construction of the subgrade (Claim 2), the job was shut down for the winter of 1954 –1955 and completion of the contract was delayed into the year 1955 to plaintiff's damage.

At the outset it is to be noted that the contract specified that all work on the project was to be completed by November 15, 1954. As of October 26, 1954, the record shows plaintiff had completed approximately 99 percent of the work, with the work remaining consisting of slight dressing to final grade over a five-mile stretch and dressing of slopes, pits and ditches. On the latter date, however, the commission issued a written, immediate suspension of all further construction activities until further notice because of severe weather conditions which had caused the subgrade to freeze and had produced six inches of snow on the road-

---

37. "Blue tops" are stakes that indicate the designed grades. As a witness testified: "A blue top is a stake that is set in the shoulder line of a grade or a roadway to show the exact line and the exact finish grade of that shoulder. The reason * * * [they are] called 'blue top' is that they are marked blue on top of the stake and they are merely for the purpose of building and for the use of the grader operators in finishing the roadway to that degree of grade."

38. It has also been mentioned previously that the board, though lacking jurisdiction, made factual findings on this claim, which findings, however, were held by this court to be gratuitous. See note 6, supra.

way. The work was resumed in the following spring (on or about May 23, 1955) and the contract was completed some three weeks later.

■ The record leaves no doubt though that plaintiff would have completed the work before the contract completion date of November 15, 1954 had its progress not been hampered by the commission's actions during that year (as in the previous year) in (i) designating substitute borrow pits to replace the pits that it had erroneously designated in the original contract drawing; (ii) ordering certain of the borrow pits enlarged; (iii) ordering plaintiff to perform borrow excavation and overhaul far in excess of the quantities shown on the contract drawings; and (iv) requiring plaintiff to use borrow material for the topping layer of the subgrade that contained a substantial amount of rocks and boulders.[39] Completion of the contract having thus been delayed through fault of the defendant, it is liable for damages incurred by plaintiff as a result of prolongation of the work into the 1955 construction season. See e. g., Jefferson Construction Co. v. United States, 392 F.2d 1006, 183 Ct.Cl. —— (April 1968) ; George A. Fuller Co. v. United States, 69 F.Supp. 409, 411, 108 Ct.Cl. 70, 94 (1947) ; Donald M. Drake Co. v. United States, 153 Ct.Cl. 433, 440 (1961) ; Speck, Delays-Damages on Government Contracts, 26 G.W.L.Rev. 505, 518 et seq. (1958).[40]

■ The last problem is to determine what elements of damage are allowable. Plaintiff's principal damage claim in this connection is for the cost of keeping its key supervisory personnel available to resume and complete the work, which cost consisted of the salaries it paid during the shut-down period to its project superintendent, project engineer and project office manager. In support of this element of damages, plaintiff states that it was required by the commission at the start of the 1954 construction season to perform extensive rehabilitation and maintenance work on the portions of the roadway constructed in 1953 to correct winter damage; that that work was far in excess of plaintiff's responsibility under the specifications; and that plaintiff, in an effort to determine in advance the extent of the rehabilitation work it would be expected to perform at the start of the 1955 construction season, sub-

39. The board concluded in its original decision that plaintiff's failure to complete the work in 1954 was due to its fault in directing equipment and personnel to other contracts and not giving proper supervision to the work—which conclusion was based on statements by the contracting officer in his findings of fact of May 4, 1955. The board's conclusion in this respect is not only gratuitous, it is unsupported by any evidence in the record. Indeed, the commission did not attempt to substantiate these facts through any of the five witnesses it called during the board hearing, or through cross-examination of plaintiff's witnesses.

40. It is also worthy of note that on October 20, 1954, when plaintiff had completed close to 99 percent of the work, it requested the commission to furnish it a punch list of any discrepancies that might deter the final acceptance of the project. The request was (apparently) made pursuant to article 5.8 of the specifications which required the government to make a semi-final acceptance upon the request of plaintiff and furnish a list of instructions as to any work necessary to final inspection and acceptance. The commission withheld action on the request for a period of six days, at the end of which time it suspended the work for the 1954 season. Plaintiff contends that the work remaining as of October 20, 1954—when it requested the punch list—was of a minimal nature which it could have completed during the remainder of that working season; that the commission's delay of six days in responding to its request made it impossible for it to complete the work during the remainder of the season; and that defendant thus breached its implied obligation to cooperate affirmatively with plaintiff in making the performance of the work possible. It is unnecessary, however, to pass upon this contention in view of the conclusion reached (for the other reasons set out) as to defendant's liability for delay-damages.

mitted a request to the commission on October 29, 1954, for a written statement outlining the extent of such work that would be required, which the commission assertedly ignored. It is argued that due to this asserted lack of cooperation by the commission, plaintiff reasonably concluded that similar maintenance work would be required of it at the start of the 1955 season and that, in such circumstances, it prudently retained its full supervisory staff from the shut-down period.

The record establishes, however, that plaintiff was verbally informed by the commission that it would not have to perform further repair work in the spring of 1955. Moreover, the commission advised plaintiff by letter dated November 2, 1954, that the portion of the roadway from milepost 36 to milepost 50.8 was considered acceptable, as was the portion from milepost 61.1 to milepost 82.1 with the exception of final cleaning up. Considering (1) that plaintiff thus had only 10 miles left (from milepost 50.8 to milepost 61.1) where it had any construction duties; (2) that it had verbal assurance from the commission that repair work would not be required; and (3) that it had another project nearby from where it could practicably have conducted much, if not all, the necessary supervisory engineering and office work, the only supervisory employee plaintiff should have realistically expected to use on the job in the following season was the project superintendent.[41] In such circumstances, it is reasonable to limit plaintiff's recovery under this item to the salary paid this one supervisory employee during the shut-down period (plus payroll taxes and insurance thereon). Plaintiff is also en-

titled to recover as damages: (1) the labor and equipment costs it incurred in demobilizing its equipment spread at the end of the 1954 season and remobilizing it at the start of the 1955 construction season; and (2) the ownership expense of maintaining in storage during the shut-down period the specific items of equipment required to complete the project. The amount of recovery will be determined pursuant to Rule 47(c).

## CONCLUSION OF LAW

Upon the foregoing opinion, which includes therein the necessary facts made as a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover as to Claim I and Claim II, Item 1, and judgment is entered for plaintiff thereon (on its own behalf and on behalf of its subcontractor) with, in the absence of agreement by the parties, the amount of recovery to be determined in the first instance by the Board of Contract Appeals of the Department of the Interior. Proceedings relating thereto are suspended for a period of 90 days from this date for such Board determination, with plaintiff to comply with appropriate provisions of the General Order of April 1, 1968, implementing Rule 100.

Plaintiff is not entitled to recover as to Claim II, Item 2, and as to this claim the petition is dismissed.

Plaintiff is entitled to recover for salary of the project superintendent, labor and equipment costs in demobilizing and remobilizing equipment, and storage expenses as set forth in the opinion under Claim III and judgment is entered accordingly with the amount of recovery to be determined pursuant to Rule 47(c).

---

41. Actually, completion of the job in 1955 was accomplished by a force of nine men working under the supervision of the project superintendent. The work consisted primarily of knocking down spoil piles, cleaning up the borrow pits, truing-up portions of the grade, and cleaning out a few plugged culverts. Due to the small amount of work remaining to be done, the project engineer was reassigned, in May 1955, to another job.